Sheldon Peters WOLFCHILD, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Nos. 03–2684L, 01–568L.

United States Court of Federal Claims.

Aug. 5, 2011.

As Corrected Aug. 18, 2011.

58

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for Wolfchild plaintiffs. With him on the briefs were William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN.

Jody H. Schwarz and Stephen Finn, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With them on the briefs were Ignacia S. Moreno, Assistant Attorney General, and Sam Costello, Daniel Steele, and J. Nathanael Watson, Trial Attorneys, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C. Of counsel were Kenneth Dalton and James Porter, Office of the Solicitor, Department of the Interior, Washington, D.C.

Jack E. Pierce, Pierce Law Firm, PA, Minneapolis, MN, for the Cermak plaintiffs and for the Stephens, R. Cermak, J. Cermak, Henderson, Klingberg, Alkire, Arnold, and Godoy groups of intervening plaintiffs.

Kelly H. Stricherz, Vermillion, SD, for the Mozak group of intervening plaintiffs.

Garrett J. Horn, Horn Law Office, Yankton, SD, for the Saul, Trudell, Taylor, Ferris,

Henry, and Vassar groups of intervening plaintiffs.

Creighton A. Thurman, Yankton, SD, for the Cournoyer, Robinette, Kimbell, French, and Wanna groups of intervening plaintiffs.

Elizabeth T. Walker, Walker Associates, Alexandria, VA, for the anonymous Walker, the Enyard, and the Kitto groups of intervening plaintiffs.

Robin L. Zephier, Abourezk & Zephier, PC, Rapid City, SD, for the Zephier group of intervening plaintiffs.

Larry Leventhal, St. Paul, MN, for the Burley group of intervening plaintiffs.

Wood R. Foster, Jr., Siegel, Brill, Greupner, Duffy & Foster, PA, Minneapolis, MN, for the Lafferty, Blaeser, Whipple, and Lowe groups of intervening plaintiffs.

Bernard J. Rooney, Amherst, WI, for the Rooney group of intervening plaintiffs.

Scott A. Johnson & Todd M. Johnson, Johnson Law Group, Minnetonka, MN, for the Rocque group of intervening plaintiffs, the Descendants of Joseph Coursolle group of intervening plaintiffs.

James L. Blair, Renaud, Cook, Drury, Mesaros, PA, Phoenix, AZ, for the anonymous Blair group of intervening plaintiffs. With him on the briefs was Barry P. Hogan, Renaud Cook Drury Mesaros, PA, Phoenix, AZ.

Gary J. Montana, Montana & Associates, Osseo, WI, for the Julia DuMarce group of intervening plaintiffs.

Nicole N. Emerson, Lynn, Jackson, Shultz & Lebrun, PC, Sioux Falls, SD, for the Garreau group of intervening plaintiffs.

Douglas Kettering, Kettering Law Office, Yankton, SD, for the Ke Zephier group of intervening plaintiffs.

Randy V. Thompson, Nolan, MacGregor, Thompson & Leighton, St. Paul, MN, for the Abrahamson group of intervening plaintiffs.

Frances Felix, pro se, Minneapolis, MN, for herself and members of her immediate family as intervening plaintiffs.

Royce Deryl Edwards, Jr., Joplin, MO, for the Robertson–Vadnais group of intervening plaintiffs.

Rory King, Bantz, Gosch & Cremer, LLC, Aberdeen, SD, for the Marvel Jean DuMarce group and the Youngbear group.

Brian L. Radke, Radke Law Office, P.C., Sioux Falls, SD, for the Schroder group of intervening plaintiffs.

## OPINION AND ORDER

LETTOW, Judge.

On December 21, 2010, the court issued the seventh opinion in this long-pending litigation involving approximately 20,750 persons of Indian descent. *Wolfchild v. United States,* 96 Fed.Cl. 302, 310 (2010) (*"Wolfchild VII"*). In that decision, the court held that plaintiffs are entitled to certain funds derived from leasing and licensing lands that had been secured and reserved for eligible Indians pursuant to Appropriations Acts passed in 1888, 1889, and 1890. *Id.* at 352. The parties have since stipulated to the amount of funds at issue as of January 1, 2011. The case is now before the court on pending cross-motions for summary judgment respecting persons who qualify as proper claimants to those funds, and on the related matter of whether the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401–1408, applies to any judgment entered in this case. In addition, since the court's opinion of December 21 was rendered, plaintiffs and plaintiff-intervenors have filed numerous motions to amend complaints and motions for summary judgment on a variety of additional substantive claims.

## FACTS[1]

As of 1862, the Minnesota Sioux consisted of four bands known as the Mdewakanton, the Wahpakoota (together comprising the "lower bands"), the Sisseton, and the Wahpeton (comprising the "upper bands"). *Wolfchild VII,* 96 Fed.Cl. at 311–12. At that time, the relationship between the Minnesota Sioux and the United States was defined and

---

1. A brief recitation of the relevant facts is provided in this decision. A detailed account of the historical background of this case can be found in this court's prior opinions, including especially its most recent opinion, *Wolfchild VII,* 96 Fed.Cl. 302.

governed by a series of treaties, which provided generally for the supply of land and funds to the Sioux. *Id.* at 312–13. In August of 1862, individuals from each of the four bands revolted against the United States, killing settlers, destroying and damaging property, and breaching the treaties then held with the United States. *Id.* at 313. As a consequence, the United States annulled its treaties with the Sioux, which had the effect of, among other things, voiding the annuities that had been granted to the Sioux under those treaties. *Id.* Additionally, the United States confiscated the Sioux lands of Minnesota and later directed that the Sioux be removed to tracts of land outside the limits of the then-existing states. *Id.* These steps were accomplished by two legislative actions taken by Congress and signed by President Lincoln in 1863: the Act of February 16, 1863, ch. 37, 12 Stat. 652, and the Act of March 3, 1863, ch. 119, 12 Stat. 819 (together, "the 1863 Acts"). *Id.*

Some of the Sioux, however, remained loyal to the United States during the uprising by either not participating in the revolt or acting affirmatively to save the settlers. *Wolfchild VII,* 96 Fed.Cl. at 313. By their actions, those Sioux severed their tribal relationships. Although Congress voided all treaties with the Sioux, in the 1863 Acts it recognized the loyalty—and ensuing hardship—of those "friendly Sioux." *Id.* at 313–14. In Section 9 of the Act of February 16, 1863, Congress authorized the Department of the Interior to assign up to eighty acres of public land to each friendly Sioux:

[T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before-named bands [the Sisseton, Wahpeton, Mdewakanton, and Wahpakoota of the Dakota or Sioux Indians] who exerted himself in rescuing the whites from the late massacre [by] said Indians. The land so set apart ... shall not be aliened or devised, except by the consent of the President of

the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of February 16, 1863, ch. 37, § 9, 12 Stat. at 654.

Two weeks after enacting this statute, Congress passed a second act providing for the friendly Sioux. The second Act of 1863 supplemented the first Act in important respects. Section 1 provided that the President was "authorized ... and directed to assign to and set apart" "outside of the limits of any state" eighty acres of "good agricultural lands" for all of the Sioux, regardless of loyalty. Act of March 3, 1863, ch. 119, § 1, 12 Stat. at 819. This grant of land "appeared to be an attempt to address the fact that the first Act of 1863 confiscated all Sioux land, leaving the Sioux with no direction as to where they might make a new home." *Wolfchild VII,* 96 Fed.Cl. at 314. In Section 4 of the second 1863 Act, Congress provided for the friendly Sioux specifically:

[I]t shall be lawful for [the] Secretary [of the Interior] to locate any meritorious individual Indian of [the four] bands, who exerted himself to save the lives of the whites in the late massacre, upon [the former Sioux reservation lands] on which the improvements are situated, assigning the same to him to the extent of eighty acres, to be held by such tenure as is or may be provided by law ... [provided] [t]hat no more than eighty acres shall be awarded to any one Indian, under this or any other act.

Act of March 3, 1863, ch. 119, § 4, 12 Stat. at 819.[2] Ultimately, no lands were provided to the friendly Sioux pursuant to the 1863 Acts; however, neither act has been repealed. *Wolfchild VII,* 96 Fed.Cl. at 315.

After additional failed legislative attempts to provide for the friendly Sioux, in 1888, 1889, and 1890, Congress enacted Appropriations Acts which provided funds to the Secretary of the Interior with an accompanying mandate to purchase for those friendly Sioux

---

**2.** The relationship between the two Acts of 1863 was a point of dispute resolved in the court's prior opinion. *See Wolfchild VII,* 96 Fed.Cl. at 314–15. Ultimately, the court concluded that the text and legislative history of the Acts demonstrated that the second Act of 1863 did not supersede the first Act; rather, the two had distinguishable scopes and were complementary in their application. *See id.*

who belonged to the Mdewakanton band specifically ("loyal Mdewakanton") land, agricultural implements, and livestock. *See Wolfchild VII*, 96 Fed.Cl. at 315–18; Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349; Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93; Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29. Unlike the prior unsuccessful Acts of 1863, under the 1888, 1889, and 1890 Appropriations Acts, land and other goods were purchased for the loyal Mdewakanton. *Wolfchild VII*, 96 Fed.Cl. at 318. The land ("1886 lands") was conveyed to eligible Mdewakanton under an assignment system, pursuant to which title was retained in the United States' name, preventing alienation and sale to others. *Id.*

■ The text delineating the beneficiary class in each Appropriation Act varied in minute respects, but the essential thrust of the Acts was Congress' desire that loyal Mdewakanton would be identified as those Mdewakanton who had severed their tribal relations and who had either remained in, or were removing to, Minnesota as of May 20, 1886.[3] To determine the persons who would be considered "loyal" Mdewakanton under Congress' definition and thus would receive the benefits of the Appropriations Acts, the Department of Interior relied upon two censuses: the McLeod listing and the Henton listing. *Wolfchild VII*, 96 Fed.Cl. at 316. The McLeod listing was generated in 1886 by U.S. Special Agent Walter McLeod and listed all of the full-blood Mdewakantons remaining in Minnesota at the time. *Id.* Under the Secretary's direction, on January 2, 1889, a supplementary census was taken by Robert B. Henton, Special Agent for the Bureau of Indian Affairs ("BIA"), of the Mdewakanton

living in Minnesota since May 20, 1886. *Id.* That listing included some mixed bloods. Together, these listings were used to distribute the benefits of the Appropriations Acts to those persons whose names appeared on the lists, and subsequently, to lineal descendants of those listed persons. *Id.*[4]

Eventually, funds were generated by and derived from the 1886 lands, which monies were placed in Treasury trust fund accounts. *Wolfchild VII*, 96 Fed.Cl. at 319–21. Some of these funds were obtained from a transfer of a portion of the 1886 lands by the United States to the Upper Mississippi River Wild Life and Fish Refuge ("the Wabasha Land Transfer"). *Id.* at 319–20. The remaining portion of the money, however, stemmed from Interior's policy of leasing or licensing 1886 lands for fair market value where no eligible Mdewakanton or lineal descendant was available for a land assignment. *Id.* at 320. In 1975, the BIA performed a detailed accounting of all funds derived from the 1886 lands then held by the Treasury. *Id.* at 321.

Around the same time, Congress altered significantly the status of the 1886 lands. In 1980, Congress provided that the 1886 lands which "were acquired and are now held by the United States for the use or benefit of certain Mdewakanton Sioux Indians," would henceforth be "held by the United States … in trust for" three Indian communities—the Shakopee Mdewakanton Sioux Community, the lower Sioux Community, and the Prairie Indian Community—which had formed in the vicinity of the several 1886 land purchases. Act of 1980, Pub.L. No. 96–557, 94 Stat. 3262 ("1980 Act"). That legislation, however, did not address the funds derived from the 1886

---

3. *See* Act of Aug. 19, 1890, 26 Stat. at 349 (defining the beneficiary class as "full and mixed blood Indians in Minnesota heretofore belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein, and have severed their tribal relations"); Act of Mar. 2, 1889, 25 Stat. at 992 (defining the beneficiary class as "full-blood Indians, in Minnesota heretofore belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May eighteen hundred and eighty-six, or who were then engaged in removing to said State, and have since resided therein,

and have severed their tribal relations"); Act of June 29, 1888, 25 Stat. at 228 (defining the beneficiary class as "full-blood Indians in Minnesota, belonging to the M[de]wakanton band of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations").

4. "Although not guaranteed under the assignment system, in practice, an assignee's land would pass directly to his children upon his death." *Wolfchild v. United States*, 62 Fed.Cl. 521, 529 (2004) ("*Wolfchild I* ").

lands then being held by the Treasury. Nevertheless, in 1981 and 1982 those funds were distributed to the three communities. *Wolfchild VII*, 96 Fed.Cl. at 323–24.[5]

## PROCEDURAL HISTORY

Plaintiffs aver that they are lineal descendants of the loyal Mdewakanton. *See Wolfchild I*, 62 Fed.Cl. at 524. They filed their complaint in this case on November 18, 2003, and since that time the number of plaintiffs has grown to approximately 20,750 persons.[6]

On October 27, 2004, the court granted partial summary judgment for plaintiffs, holding that a trust for the benefit of the loyal Mdewakanton and their lineal descendants was created by the Appropriations Acts. *See Wolfchild I*, 62 Fed.Cl. at 555.[7] Approximately two and one half years after that decision, the government interposed a motion to certify the court's decisions in *Wolfchild I*, *Wolfchild II*, and *Wolfchild III* for interlocutory appeal under 28 U.S.C. § 1292(d). *See Wolfchild v. United States*, 78 Fed.Cl. 472 (2007) ("*Wolfchild V*"). The court granted the government's motion in part and certified the questions of whether the Appropriations Acts created a trust for the loyal Mdewakanton and their lineal descendants, and whether, if the Acts created such a trust, Congress terminated that trust with the 1980 Act. *Id.* at 485. The Federal Circuit granted interlocutory appeal of those two questions, and reversed this court's conclusions in both respects. *See Wolfchild v. United States*, 559 F.3d 1228, 1231 (Fed.Cir.

2009) ("*Wolfchild VI*"), *cert. denied*, —— U.S. ——, 130 S.Ct. 2090, 176 L.Ed.2d 755 (2010).

The court of appeals concluded that the Appropriations Acts did not create a trust for the benefit of the loyal Mdewakanton nor did they vest title, legal or otherwise, in that group, notwithstanding the language and usage reflected in the land assignments and certain historical legal memoranda. *Wolfchild VI*, 559 F.3d at 1240–41, 1249. It concluded instead that "the Appropriations Acts are best interpreted as merely appropriating funds subject to a statutory use restriction." *Id.* at 1240. The court determined as well that the 1980 Act extinguished any trust that would have been created by the Appropriations Acts. *Id.* at 1259–60. The Federal Circuit remanded the case to this court to address one outstanding question: "whether it was lawful for the Interior Department, following the 1980 Act, to transfer to the three communities approximately $60,000 in funds that had been collected as proceeds from the sale, use, or leasing of certain of the 1886 lands, given that the 1980 Act was silent as to the disposition of those funds." *Id.* at 1259 n. 14.

On December 21, 2010, in *Wolfchild VII*, this court granted partial summary judgment to plaintiffs respecting entitlement to those funds derived from the 1886 lands and held in trust accounts prior to 1981 and 1982. 96 Fed.Cl. at 352. After rejecting both statute-of-limitations and jurisdictional challenges, the court concluded that the government acted without authority and in contravention of the Appropriations Acts when it distributed the funds to the three communities as op-

---

5. A detailed description of the historical genesis of the three communities and the role they played in the events of this case is provided in the court's immediately prior opinion. *See Wolfchild VII*, 96 Fed.Cl. at 318–19. In brief, the communities are organized as independent entities under the Indian Reorganization Act, Act of June 18, 1934, ch. 576, 48 Stat. 984 (also known as the Wheeler–Howard Act) (codified as amended at 25 U.S.C. §§ 461–79). *Id.* "Although [some] loyal Mdewakanton [and their descendants] resided in the three communities, the three communities were [not] and are not exclusively comprised of descendants of the loyal Mdewakanton, and many of the descendants of the 1886 Mdewakantons are not enrolled members of any of the three communities." *Wolfchild VII*,

96 Fed.Cl. at 319 (internal quotation marks omitted).

6. Plaintiffs number about 7,500 persons, and 41 separate groups totaling about 13,250 people were granted leave to intervene as plaintiffs. *See Wolfchild v. United States*, 77 Fed.Cl. 22, 31–35 (2007) ("*Wolfchild IV*").

7. The government's motion for reconsideration of this decision was denied in *Wolfchild v. United States*, 68 Fed.Cl. 779 (2005) ("*Wolfchild II*"). The court addressed procedural issues in *Wolfchild v. United States*, 72 Fed.Cl. 511 (2006) ("*Wolfchild III*"), and *Wolfchild IV*, 77 Fed.Cl. 22.

posed to the lineal descendants of the loyal Mdewakanton. *See id.* at 331–48. The court concluded that plaintiffs' entitlement did not extend, however, to funds traceable to the Wabasha Land Transfer. *See id.* at 346. This was so because the 1944 Act dictating the transfer of those lands "provided that the . . . funds be paid to a broader set of beneficiaries and conferred upon the Secretary supplemental authority to distribute those funds, thus freeing the disbursement of the Wabasha funds from the statutory restrictions of the Appropriations Acts." *Id.*

The court determined as well that the 1980 Act did not terminate plaintiffs' entitlement to the funds accrued before that law took effect because "the 1980 legislation dealt only with the 1886 lands, and because such funds were collected and [were to be] disbursed pursuant to authority derived by the Secretary from the Appropriations Acts." *Wolfchild VII*, 96 Fed.Cl. at 349. However, because the 1980 Act created a trust for the three communities, with the 1886 lands constituting the trust corpus, the court concluded that after 1980, but not before, "the three communities, not the plaintiffs, would be entitled to any income derived from those lands because the communities have become the trust beneficiaries." *Id.* In sum, the court held that "as lineal descendants of the 1886 Mdewakanton, plaintiffs were entitled to the funds derived from leasing and licensing [of] the 1886 lands prior to the passage of the 1980 Act," excluding those funds traceable to the Wabasha Land Transfer. *Wolfchild VII*, 96 Fed.Cl. at 351.

In that same opinion, the court addressed motions to amend complaints filed by the Julia DuMarce Group and the Harley D. Zephier Group of plaintiff-intervenors. *Wolfchild VII*, 96 Fed.Cl. at 335–36. Those motions sought to add claims based upon the Act of February 16, 1863. The court granted leave to amend such that the parties could address "the salient threshold question . . . [of] whether the first Act of 1863 can be read as giving rise to a money-mandating duty under controlling precedent," a question which, at that time, none of the parties had addressed. *Id.* at 336.

Following a status conference held January 21, 2011, the parties and the court identified the three remaining issues that were required to be resolved before the court could enter final judgment in this case. Those issues were: (1) the amount of money involved in the claim delineated in the *Wolfchild VII* opinion, (2) the persons who qualified as proper claimants in this case, and (3) the role, if any, of the 1863 Acts. *See* Scheduling Order, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. Jan. 21, 2011), ECF No. 843. On March 7, 2011, the parties stipulated that the funds to which plaintiffs are entitled pursuant to the court's opinion in *Wolfchild VII*, brought forward to January 1, 2011, are in the amount of $673,944.00. *See* Stipulation as to 1886 Funds, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Apr. 1, 2011), ECF No. 1030. The latter two issues involving eligible claimants and the role of the 1863 Acts remain, however, a source of significant dispute in this case.

Plaintiffs and many plaintiff-intervenors have filed motions to amend their respective complaints to incorporate claims based upon both Acts of 1863 and claims grounded in the Indian Non–Intercourse Act, 25 U.S.C. § 177 ("Non–Intercourse Act"). Plaintiffs have also filed a motion for summary judgment on the issue of claimant eligibility as to the stipulated funds, in which motion plaintiff-intervenors have also joined. Attendant to the issue of claimant eligibility, plaintiffs and plaintiff-intervenors have submitted extensive materials relating to their respective genealogies.

The government opposes plaintiffs' and plaintiff-intervenors' proposed amendments, arguing that such amendments would be futile. Def.'s Mem. in Support of Its Motion to Dismiss ("Def.'s Mem.") at 21. The government additionally has filed a motion to dismiss or, in the alternative, a cross-motion for summary judgment, as well as a motion to defer consideration of eligibility under Rule 56(f) of the Rules of the Court of Federal Claims ("RCFC"), which rule has recently been revised to become Rule 56(d). Among other things, the government has requested that the court defer consideration of the facts submitted by plaintiffs concerning their re-

spective genealogies until the court resolves the outstanding issues of generic entitlement. A hearing was held on the pending motions on May 13, 2011.

After full briefing of the dispositive motions had been completed and the hearing was held, the government raised an entirely new and significant issue of law in a joint status report filed May 27, 2011. In that report, the government contended that the Indian Tribal Judgment Fund Use or Distribution Act, Pub.L. No. 93–134, § 1, 87 Stat. 466 (1973) (codified as amended at 25 U.S.C. §§ 1401–08) ("Indian Judgment Distribution Act"), applies to any distribution of funds that may occur as a result of a final judgment in this case. On June 3, 2011, the court requested that the parties file supplemental briefs addressing the potential applicability of the Indian Judgment Distribution Act to this case, and those briefs have been filed. The pending motions accordingly are ready for disposition.

## I. MOTIONS TO AMEND COMPLAINTS

### A. Applicable Criteria

■■■ Under RCFC 15(a)(2), "[t]he court should freely give leave [to amend pleadings] when justice so requires." So long as "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Mitsui Foods, Inc. v. United States,* 867 F.2d 1401, 1403–04 (Fed.Cir.1989). Although a court ought to exercise liberally its discretion to grant leave to amend, " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment,' may justify the denial of a motion for leave to amend." *Mitsui Foods,* 867 F.2d at 1403–04 (quoting *Foman,* 371 U.S. at 182, 83 S.Ct. 227); *see also Henry E. & Nancy Horton Bartels Trust ex rel. Cornell Univ. v. United States,* 88 Fed.Cl. 105, 111 (2009), *aff'd,* 617 F.3d 1357 (Fed.Cir.2010). Where one of

these adverse factors exists, denial of the request for leave to amend is appropriate. *See Te–Moak Bands of W. Shoshone Indians of Nev. v. United States,* 948 F.2d 1258, 1261 (Fed.Cir.1991) (affirming Claims Court's denial of motion to amend pleadings based on undue delay and failure to cure in an earlier-allowed amendment); *Mitsui Foods,* 867 F.2d at 1403–04 (Court of International Trade's denial of motion to amend justified upon "apparent futility"); *Rockwell Automation, Inc. v. United States,* 70 Fed.Cl. 114, 122–24 (2006) (denial of motion to amend pleadings due to decade-long delay and prior opportunities to seek amendment).

■■■ Regarding futility, "[a] motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss." *Shoshone Indian Tribe of the Wind River Reservation, Wyo. v. United States,* 71 Fed.Cl. 172, 176 (2006) (citing *Slovacek v. United States,* 40 Fed.Cl. 828, 834 (1998)). In this regard, "[w]hen a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.,* 464 F.3d 1339, 1354–55 (Fed.Cir.2006); *see also Cultor Corp. v. A.E. Staley Mfg. Co.,* 224 F.3d 1328, 1333 (Fed.Cir.2000) ("[Plaintiff] has not made a colorable argument of possible success.... Futility was apparent, and is adequate grounds for the denial of leave to amend."); *Webster v. United States,* 74 Fed.Cl. 439, 444 (2006) (denying motion to amend where proposed claims were based upon statute that did not provide a predicate for jurisdiction).

■■■ At this juncture, the court must consider also the standard governing jurisdictional challenges, as those objections form the basis of the government's futility arguments. " 'Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits.' " *Ultra–Precision Mfg. Ltd. v. Ford Motor Co.,* 338 F.3d 1353,

1356 (Fed.Cir.2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed.Cir.2002)); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). When considering a jurisdictional dispute, the court draws all reasonable inferences in favor of the plaintiff and accepts as true the undisputed allegations in the complaint. *De Maio v. United States*, 93 Fed.Cl. 205, 209 (2010) (citing *Hamlet v. United States*, 873 F.2d 1414, 1415–16 (Fed.Cir.1989)). Nonetheless, a plaintiff will not defeat a jurisdictional challenge by "rely[ing] merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction." *Murphy v. United States*, 69 Fed. Cl. 593, 600 (2006).

 Ultimately, it is the plaintiff who bears the burden of establishing by a preponderance of the evidence the court's subject matter jurisdiction over its claim. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed.Cir.2010). "In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993) (citing *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988)).

### B. *Amendments Based on the Indian Non–Intercourse Act*

 The Indian Non–Intercourse Act provides, in relevant part:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, *from any Indian nation or tribe of Indians,* shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177 (emphasis added).[8] The Non–Intercourse Act "bars conveyances by Indians to non-Indians unless made or ratified by Congress." *Seneca Nation of Indians v. New York*, 382 F.3d 245, 248 (2nd Cir.2004); *see also Catawba Indian Tribe of S. Car. v. United States*, 982 F.2d 1564, 1566 (Fed.Cir.1993) (Under the Non–Intercourse Act, "transfers of title to Native American lands [a]re prohibited unless [made] pursuant to a treaty approved by the United States."). Its purpose is to "prevent unfair, improvident, or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress and to enable the [g]overnment, acting as *parens patriae* for the Indians, to vacate any disposition of their lands made without its consent." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960).

Plaintiffs contend that they have a viable claim under the Non–Intercourse Act on two grounds. First, plaintiffs aver that because Interior has "never fulfilled its obligations to set aside a land base for the friendly Sioux from the former Sioux reservation," it has contravened the Non–Intercourse Act. Pls.' Mot. for Summ. Judgment ("Pls.' Mot.") at 17. Plaintiffs' second claim under the Non–Intercourse Act is less succinctly stated and reflects historical facts upon which the parties do not agree.

The parties concur that in 1865 Reverend Samuel D. Hinman identified twelve sections of land in Minnesota to set aside for the friendly Sioux pursuant to the 1863 Acts. *See* Def.'s Mem. at 8; Pls.' Mot. at 9.[9] Plaintiffs contend those twelve sections of land were identified at the request of the Secretary and were set aside for the friendly Sioux, but no transfers, assignments, nor allotments to individual Sioux were made due to hostility

8. The current version of the Non–Intercourse Act was enacted as Section 12 of the Trade and Intercourse Act of 1834, ch. 161, 4 Stat. 730. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 242 n. 9, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985).

9. Reverend Hinman was a protégé of Bishop Henry B. Whipple, a man who had lobbied for benefits for the friendly Sioux after the uprising. Pls.' Mot. at 9.

from white settlers in the area of those sections. Pls.' Mot. at 9; *see also* Pls.' Resp. at 1–2. Two years later, the twelve sections of land, along with all former Sioux reservation lands, were conveyed through public sale pursuant to a proclamation by President Andrew Johnson. Pls.' Mot. at 9. Plaintiffs aver that the twelve sections of land, once set aside, "remained their tribal, aboriginal lands." *Id.* at 23. They argue that the public sale of those twelve sections constituted a violation of the Non–Intercourse Act. *Id.* at 24.[10]

The government contends that although the Secretary approved Reverend Hinman's identification of the twelve sections as putative set asides for the loyal Sioux, those twelve sections were never actually set aside and no land grants under the 1863 Acts were ever made. Def.'s Mem. at 8.[11] It argues that the identification of land for future possible grants to the friendly Sioux is thus an insufficient basis for plaintiffs' claims because plaintiffs never obtained any vested interests in those lands. *Id.* at 51. The government responds as well that the Non–Intercourse Act does not apply to actions taken by the United States, that plaintiffs and plaintiff-intervenors are not a "tribe" within the meaning of the Act, that the twelve sections of land were not tribal lands, and that the Non–Intercourse Act is not a money-mandating statute upon which to base a claim in this court. Def.'s Mem. at 44–53. Additionally, the government asserts that any claims grounded in the 1863 Acts are barred by the statute of limitations. *Id.* at 35. The factual disputes over the twelve sections of land need not be resolved because plaintiffs' claim based upon the Non–Intercourse Act fails for other reasons.

 In every case brought in federal court, the plaintiff must establish its standing to bring suit. *See Elk Grove Unified Sch.*

*Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). The Supreme Court's "standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–62 [112 S.Ct. 2130, 119 L.Ed.2d 351] (1992); and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove,* 542 U.S. at 11–12, 124 S.Ct. 2301 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Prudential standing looks to whether "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also McKinney v. United States Dep't of Treasury,* 799 F.2d 1544, 1549–51 (Fed.Cir.1986). In other words, it asks "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *see also Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

 As made explicit by the text of the statute, a fundamental requisite to maintaining a claim based upon the Non–Intercourse Act is that the claimants constitute an Indian tribe (or nation). *See* 25 U.S.C. § 177 ("from any *Indian nation or tribe of Indians*") (emphasis added); *Seneca Nation,* 382 F.3d at 258 ("In order to establish a violation of the Non–Intercourse Act, [plaintiffs] are required to establish that: (1) *they are an Indian tribe* ....") (emphasis added); *Gold-*

---

**10.** In related vein, plaintiffs contend that the public sale of the lands breached the first Act of 1863 because that Act dictated that once the Secretary set aside the public lands for the friendly Sioux, the consent of the President was required to alienate or devise such land. Pls.' Mot. at 23. This argument fails under plaintiffs' own version of events because the sale of such land was premised upon a proclamation by President Johnson authorizing the sale of all former

Sioux reservation land, of which the twelve sections were a part.

**11.** The parties concur that sometime between 1868 and 1869, a further attempt to set aside land under the 1863 Acts was made but ultimately those lands were never set aside. Pls.' Mot. at 9–10; Def.'s Mem. 8–9.

*en Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 56 (2d Cir.1994) (same); *Mashpee Tribe v. Secretary of Interior,* 820 F.2d 480, 482 (1st Cir.1987) (same). Specifically, plaintiffs are required to demonstrate that they "represent entities that (1) were tribes at the time the land was alienated and (2) remain tribes at the time of suit." *Mashpee Tribe,* 820 F.2d at 482.

This element is required not only for substantive relief under the statute, but it is also a firmly-established requisite for standing to bring a claim under the Non–Intercourse Act. *See San Xavier Dev. Auth. v. Charles,* 237 F.3d 1149, 1152 (9th Cir.2001) ("Only Indian tribes may bring § 177 actions, and 'individual Indians do not even have standing to contest a transfer of tribal lands on the ground that the transfer violated that statute.'" (quoting *United States v. Dann,* 873 F.2d 1189, 1195 (9th Cir.1989))); *Epps v. Andrus,* 611 F.2d 915, 918 (1st Cir.1979) ("As the courts have stated repeatedly, claims on the part of individual Indians or their representative are not cognizable in federal courts under the Indian Trade and Non–Intercourse Act.... In short, since plaintiffs are not suing as a tribe, they do not have standing to bring this claim ....") (citations omitted), *overruled on other grounds, James v. Watt,* 716 F.2d 71, 74 (1st Cir.1983); *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 581 (1st Cir.1979) ("Plaintiff must prove that it meets the definition of 'tribe of Indians' as that phrase is used in the Non[-I]ntercourse Act both in order to establish any right to recovery and to establish standing to bring this suit."); *Nahno–Lopez v. Houser,* 627 F.Supp.2d 1269, 1277 (W.D.Okla.2009) ("Only tribes have standing to bring claims under [the Non–Intercourse Act]; individual Indians do not have standing under this Act."), *aff'd,* 625 F.3d 1279 (10th Cir.2010); *State of N.J. v. City of Wildwood,* 22 F.Supp.2d 395, 404 (D.N.J.1998) ("Only the Tribe has standing to vindicate its rights under the Non–Intercourse Act...."); *Canadian St. Regis Band of Mohawk Indians v. State of N.Y.,* 573 F.Supp. 1530, 1534–37 (N.D.N.Y.1983) (discussing in detail tribal status as an element of standing under the Non–Intercourse Act).

Just as Article III standing is a "threshold jurisdictional issue," *Southern Calif. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1328 (Fed.Cir.2005), the "prudential standing doctrine[ ] represents the sort of 'threshold question' ... [that] may be resolved before addressing jurisdiction." *Tenet v. Doe,* 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005); *see also Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 584–85, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("While *Steele* [*Steel* ] Co. reasoned that subject matter jurisdiction necessarily precedes a ruling on the merits, the same principle does not dictate a sequencing of jurisdictional issues.... It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."); *Warth,* 422 U.S. at 517–18, 95 S.Ct. 2197 ("The rules of standing, whether as aspects of the Art[icle] III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of courts, are *threshold determinants of the propriety of judicial intervention.*") (emphasis added); *The Wilderness Soc. v. Kane Cnty., Utah,* 632 F.3d 1162, 1168 (10th Cir.2011) (en banc) ("Because [plaintiff] lacks prudential standing, we proceed directly to that issue without deciding whether [plaintiff] has constitutional standing or whether the case is moot.").

This case has proceeded for the past eight years on the foundational finding by this court that plaintiffs are not a tribe but that they could bring a suit under the Indian Tucker Act because they are an identifiable group of American Indians residing with the territorial limits of the United States. In its first opinion in this case, the court stated unequivocally: "The lineal descendants are unable to sue as a tribe because they necessarily had to sever their tribal relations prior to 1886 to qualify as beneficiaries of the 1888, 1889, and 1890 Acts, but they were and still remain an identifiable group of American Indians." *Wolfchild I,* 62 Fed.Cl. at 540; *see also Wolfchild VII,* 96 Fed.Cl. at 338 ("The loyal Mdewakanton are an 'identifiable group of American Indians' within the meaning of the [Indian Tucker] Act."). Indeed, in their most recent filing, plaintiffs go even further and avow that "the [c]ourt's forthcoming final

judgment will be *in favor of individuals— not in favor of a group."* Pls.' Supplemental Br. at 2 (emphasis added).

Notwithstanding the long-established conclusions of this court and plaintiffs' own representations, plaintiffs contend that the Appropriations Acts' identification of loyal Mdewakanton as statutory beneficiaries recognized that group as a "tribe." Pls.' Mot. at 25. They further represent that the loyal Mdewakanton are "a federally[-]recognized group of Indians as a result of the 1886 enrollment and supplement." Pls.' Resp. and Reply at 14. Plaintiffs assert additionally that "the 'friendly Sioux' identified in the 1863 Acts were … a 'tribe' for the purposes of the Non[-]Intercourse Act," and that because plaintiffs are the beneficiaries of the Appropriations Acts, plaintiffs are the successors in interest to any claims the friendly Sioux would have under the Non–Intercourse Act. Pls.' Mot. at 21, 27–28.

The Non–Intercourse Act does not provide a definition of the term "tribe." In *United States v. Candelaria,* 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), however, the Supreme Court interpreted "tribe" for purposes of the Non–Intercourse Act as being " 'a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory.' " (quoting *Montoya v. United States,* 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901)) (the *"Montoya/Candelaria* definition"); *see also Golden Hill,* 39 F.3d at 59 (adopting and applying the *Montoya/Candelaria* definition);[12] *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 377 n. 8 (1st Cir.1975) (same); *Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp.,* 418 F.Supp. 798, 807 n. 8 (D.R.I.1976) (same). Although a group of Indians may constitute a "tribe" for the purposes of the Non–Intercourse Act without being a tribe formally recognized by the federal government, *Golden Hill,* 39 F.3d at 59, courts have looked as well to the BIA regulations governing federal recognition for fur-

ther guidance on the meaning of "tribe" within the Non–Intercourse Act. *See id.* (noting that BIA regulations require that: "(a) they have been identified since 1900 as 'American Indian' or 'aboriginal' on a substantially continuous basis, (b) a predominant portion of their group comprises a distinct community and has existed as such from historical times to the present, and, (c) they have maintained tribal political influence or authority over its members as an autonomous entity throughout history until the present"). Importantly, "[t]he *Montoya/Candelaria* definition and the BIA criteria both have anthropological, political, geographical and cultural bases and *require, at a minimum, a community with a political structure." Id.* (emphasis added).

■ There has been no evidence put forth that plaintiffs are a tribe within the meaning of this definition. The sole documents upon which plaintiffs rely to establish their status are the birth certificates which have been submitted in support of plaintiffs' eligibility as claimants under the Appropriations Acts. *See* Pls.' Resp. and Reply at 16 ("Plaintiffs' birth certificates collected by anthropologist Dr. Barbara Buttes[ ] indicate anthropological, political, [and] geographical … ties."). While those birth certificates demonstrate, as an incidental matter, that individual loyal Mdewakanton and their descendants share anthropological or geographical connections through familial unions, they are insufficient to show that plaintiffs constituted in the past or constitute now a united community, existing and living under one leadership or government and inhabiting a particular territory. Indeed, plaintiffs do not even allege those pertinent facts to be true; their claim is based upon severance, not continuation, of tribal ties.

Reference to a case in which a group of non-federally-recognized Indians was deemed a "tribe" in accord with the *Montoya/Candelaria* definition is instructive. In *New York v. Shinnecock Indian Nation,* 400 F.Supp.2d 486 (E.D.N.Y.2005), New York sued to enjoin

**12.** Notably, in *Golden Hill,* the Second Circuit remanded the matter to the district court on the basis of the primary jurisdiction doctrine, concluding that a stay of plaintiff's action was ap-

propriate to allow the Department of the Interior to rule on plaintiff's pending petition for tribal recognition. 39 F.3d at 58–61.

the construction and operation of a gaming casino by the Shinnecock. In determining whether the Shinnecock constituted a "tribe" and were thus entitled to invoke its sovereign immunity against such suit, the court employed the *Montoya/Candelaria* definition and concluded that the Shinnecock were a tribe. The court's determination was based upon, among other things, that: (1) the Shinnecock had been recognized as a tribe by New York for more than 200 years; (2) the tribe had offices and was located on a reservation, (3) tribal officials were the plaintiffs and were suing in their official capacity, and (4) the tribe had selected or elected tribal leaders in every year from 1792 through 2004. *Id.* at 487–90.[13]

Plaintiffs' reliance on the formation of the Minnesota Mdewakanton Dakota Oyate ("Mdewakanton Oyate") is unavailing. Plaintiffs established the Mdewakanton Oyate on March 26, 2004, subsequent to the initiation of this lawsuit. Pls.' Mot. and Br. Regarding Notice to Lineal Descendants at 8, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed March 21, 2005). That association was formed as "a Minnesota non-profit corporation ... for the purpose of organizing the trust beneficiaries for business purposes." *Id.* At a minimum, existence of the Mdewakanton Oyate fails to satisfy the requirement under the Non–Intercourse Act that plaintiffs constitute a tribe at the time of the allegedly unlawful sale of land and at the time of the initiation of suit. *See Mashpee Tribe,* 820 F.2d at 482; *see also Abraxis*

*Bioscience, Inc. v. Navinta LLC,* 625 F.3d 1359, 1364 (Fed.Cir.2010) ("A court may exercise jurisdiction only if a plaintiff has standing to sue *on the date it files suit.*" (citing *Keene Corp. v. United States,* 508 U.S. 200, 207, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993); *Minneapolis & St. Louis R.R. v. Peoria & Perkin Union Ry. Co.,* 270 U.S. 580, 586, 46 S.Ct. 402, 70 L.Ed. 743 (1926))). What is more, the Mdewakanton Oyate has never been and is not now a plaintiff in this lawsuit. *See* Wolfchild Pls.' Objections & Admissions to United States' Proposed Findings of Uncontroverted Fact at 2, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed May 4, 2011), ECF No. 1047.

In sum, the court concludes that plaintiffs are not a "tribe" within the meaning of the Non–Intercourse Act. Plaintiffs thus lack standing to bring a suit grounded in that Act.[14]

*C. Amendments Based upon the 1863 Acts*

Plaintiffs seek to amend their complaints to allege that plaintiffs were statutorily entitled to the benefits of the 1863 Acts, and that the 1863 Acts created a "fiduciary (trust) relationship" between the government and plaintiffs under which the government was required "to provide land to the group of 'friendly Sioux' as statutory beneficiaries." Pls.' Proposed Seventh Am. Compl. ¶¶ 117, 119. This proposed amendment would echo the amendments previously made to the complaints of the Julia DuMarce and Harley Zephier groups of intervening plaintiffs. *See Wolfchild VII,* 96 Fed.Cl. at 335–36. Other

---

**13.** In support of their contentions, plaintiffs cite to *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649 (D.Me.1975), *aff'd,* 528 F.2d 370, and *Narragansett Tribe,* 418 F.Supp. 798, in which, according to plaintiffs, the court recognized as a "tribe" under the Non–Intercourse Act similarly placed "landless Indian groups [that had] enrolled people into their purported tribe via genealogical qualification per birth certificates and similar documents." Pls.' Mot. at 27. Yet, those cases did nothing of the sort. In *Passamaquoddy,* "it [wa]s stipulated that the Passamaquoddies are a 'tribe of Indians,'" 388 F.Supp. at 656, and in *Narragansett Tribe,* that issue was explicitly reserved for trial, 418 F.Supp. at 807 n. 8, 808. And far from being "landless Indian groups" that were then enrolling members via birth certificates, the named plaintiff in *Passamaquoddy* was "the official governing body of the Passamaquoddy Tribe,

a tribe of Indians residing on two reservations in the State of Maine ... [that] since at least 1776 ... have constituted and continue to constitute a tribe of Indians in the racial and cultural sense." 388 F.Supp. at 651–52.

**14.** Plaintiffs' argument that the "friendly Sioux" identified in the 1863 Acts were a "tribe" and that plaintiffs have inherited those claims, Pls.' Mot. at 21, 22–28, is equally unavailing. No evidence before the court shows that the "friendly Sioux" constituted either in 1863 or now a distinct "tribe," and Congress' reference in the 1863 Acts to "each *individual* of the [four Bands of Sioux Indians] who exerted himself in rescuing the whites," *see, e.g.,* Act of Feb. 16, 1863, ch. 37, § 9, 12 Stat. at 654, demonstrates that Congress recognized in the 1863 Acts *individual Sioux Indians*—not a separate tribal entity.

groups of intervening plaintiffs now join plaintiffs in moving for comparable amendments. *See, e.g.,* Taylor Group's Proposed Third Am. Compl. ¶¶ 117–138, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed March 21, 2011), ECF No. 947. The government contends that plaintiffs' requests must be denied because the 1863 Acts are not money-mandating statutes upon which jurisdiction in this court can be founded nor do they impose fiduciary duties on the government. *See* Def.'s Mem. at 24–28. The government argues also that any such claims are barred by the statute of limitations. *Id.* at 35–39.

### 1. *Money-mandating duty.*

 It is axiomatic that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I* "). Congress has consented to suit by way of the Indian Tucker Act, 28 U.S.C. § 1505, which provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

 The Indian Tucker Act provides a jurisdictional platform for suit but does not itself "create[ ] a substantive right enforceable against the [g]overnment by a claim for money damages." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003). As with the Tucker Act, a plaintiff grounding its claim in the Indian Tucker Act must demonstrate that some other source of law creates a money-mandating right or duty that falls within the ambit of the waiver of sovereign immunity. *See United States v. Navajo Nation,* 556 U.S. 287, 288-90, 129 S.Ct. 1547, 1551–52, 173 L.Ed.2d 429 (2009) ("*Navajo II* "); *see also Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (en banc). Where plaintiff alleges that a statute provides such a right or duty, "the statute [must] be 'fairly interpreted' or 'reasonably amen[ ]able' to the interpretation that it 'mandates a right of recovery in damages.' " *Adair v. United States,* 497 F.3d 1244, 1250 (Fed.Cir.2007) (quoting *White Mountain Apache,* 537 U.S. at 472–73, 123 S.Ct. 1126). If the court determines that the statute upon which plaintiff relies does not impose upon the government a duty which gives rise to a claim for money damages, then the court lacks subject matter jurisdiction over the claim. *Adair,* 497 F.3d at 1251 (citing *Fisher,* 402 F.3d at 1173); *see also Greenlee Cnty., Ariz. v. United States,* 487 F.3d 871, 876 (Fed.Cir.2007); *Perri v. United States,* 340 F.3d 1337, 1340–41 (Fed.Cir.2003).

To determine whether the two Acts of 1863 provide the money-mandating duty needed to invoke this court's jurisdiction, the court must look first to the text of the Acts. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *see also Sursely v. Peake,* 551 F.3d 1351, 1355 (Fed.Cir.2009). "[W]here the statutory text leaves the government no discretion over payment of claimed funds," Congress has provided a money-mandating source of law for jurisdiction in this court. *Samish Indian Nation v. United States,* 419 F.3d 1355, 1364 (Fed.Cir.2005). Where, however, the statute "gives the government complete discretion over the decision whether or not to pay an individual or group," the statute is not money-mandating. *Doe v. United States,* 463 F.3d 1314, 1324 (Fed.Cir.2006); *see also Hopi Tribe v. United States,* 55 Fed.Cl. 81, 86–87 (2002); *Lewis v. United States,* 32 Fed.Cl. 59, 63 (1994). In this regard, a distinction lies between those statutes which employ mandatory language such as "shall" and those that use permissive language such as "may" or similar terms. *Compare Greenlee Cnty.,* 487 F.3d at 877 (Payment in Lieu of Taxes Act, 31 U.S.C. §§ 6901–07, was money-mandating where

pertinent provision stated that Secretary of Interior "shall make a payment" to the local government), *and Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed.Cir.2003) (5 U.S.C. § 5942(a) was money-mandating where it provided that employees were "entitled" to certain pay and such funds "shall be paid under regulations prescribed by the President"), *with Perri*, 340 F.3d at 1341 (Fed.Cir. 2003) (28 U.S.C. § 542 was "money-authorizing statute, not a money-mandating one," where statute established the Department of Justice Assets Forfeiture Fund and provided that funds for the payment of certain awards "shall be available to the Attorney General"); *and Hopi Tribe*, 55 Fed.Cl. at 87–92 (25 U.S.C. § 640d–7(e) was not money-mandating where the pertinent provision stated "[t]he Secretary of Interior is authorized" to pay the legal fees of certain tribes).

The first Act of 1863 provided that the Secretary was "authorized" to set apart eighty acres of land to any friendly Sioux. Act of Feb. 16, 1863, § 9, 12 Stat. at 654. The statutory sentence which follows governs the disposition of such lands once they are set apart for an individual Indian. *Id.* Similarly, the relevant language of the second Act of 1863 stated that "[i]t shall be lawful for the Secretary" to assign to the individual friendly Sioux eighty acres of land. Act of March 3, 1963 § 4, 12 Stat. at 819. The plain language of the Acts reveals that the legislation only permits—not mandates—the Secretary to provide the lands to individual qualified Sioux. Merely "authorizing" or, in even more discretionary terms, making it "lawful" for the Secretary to commit certain lands to friendly Sioux is identical to or even more permissive in character than the legislation at issue in *Perri* and *Hopi Tribe*. Plaintiffs contend, however, that even if the statutory text is facially discretionary, that presumption is rebutted by the legislative history and the structure of the Acts. *See* Pls.' Mot. at 35–36; Pls.' Resp. and Reply at 22–25, 28.

The Federal Circuit has indeed acknowledged that "[c]ertain discretionary [statutory] schemes also support claims within the Court of Federal Claims' jurisdiction." *Samish*, 419 F.3d at 1364. While discretionary terms may trigger the presumption that

the statute is not money-mandating, that presumption can be overcome by " 'the intent of Congress and other inferences that [the court] may rationally draw from the structure and purpose of the statute at hand.' " *Doe*, 463 F.3d at 1324 (quoting *McBryde v. United States*, 299 F.3d 1357, 1362 (Fed.Cir. 2002)); *see also Doe v. United States*, 100 F.3d 1576, 1579–82 (Fed.Cir.1996). In this regard, the Federal Circuit has stated: "[A] statute is not wholly discretionary, even if it uses the word 'may' when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Doe*, 463 F.3d at 1324 (citing *Samish*, 419 F.3d at 1364–65).

Plaintiffs contend that the language of the 1863 Acts meets these requirements because the 1863 Acts specifically delineate the class of persons to whom the Secretary could grant the land, specify the precise amount of land (eighty acres), and require the Secretary to make that acreage available for each individual Indian who met the criterion of having exerted themselves to save the settlers during the revolt. Pls.' Resp. and Reply at 25. Plaintiffs' proffered analysis nonetheless fails to address the circumstance that the plain terms of the 1863 Acts do not "compel[ ] payment once certain conditions are met." *Doe*, 463 F.3d at 1324. The strongly discretionary language of the Acts constitutes an impediment to plaintiffs' claims.

Plaintiffs argue also that the legislative history espouses a mandatory intent contrary to the discretionary language of the statute. Pls.' Resp. and Reply at 28. In this vein, plaintiffs point to two statements made by Senators prior to the passage of the first Act of 1863. The first statement, by Senator Fessenden, provides:

I have referred to the last section of the bill simply to show in what way the committee [of Indian Affairs] propose[s] to take care of these friendly Indians. They propose to direct the Secretary of the Inte-

rior to set apart for each of them one hundred and sixty acres of the public land....

Cong. Globe, 37th Cong., 3d Sess. 511 (1863). The second statement, by Senator Harlan, reads:

> I think the provision is well enough as it is. I think we should reward Indians, who, under the circumstances that surrounded this case, exerted themselves to protect white inhabitants. This was the opinion of the committee. This was the opinion of the committee—or of several members of the committee, I know—that they ought to be rewarded, ought to be distinguished from other Indians.... [15]

Cong. Globe, 37th Cong., 3d Sess. 514 (1863); see Pls.' Mot. at 28.

The first sentence of Senator Fessenden's statement establishes that the purpose of the pertinent section of the first Act of 1863 was indeed to care for the friendly Sioux but does not speak to the force of the direction to the Secretary of the Interior. His further observation that the relevant section "propose[s] to direct the Secretary" could touch on that issue, but it does not explicitly do so, and even if it did, one remark by one Senator is inadequate to overcome the unambiguous, plainly discretionary terms ultimately passed by the entire Congress. Senator Harlan's statement is even more equivocal, illuminating only his personal opinion that the Indians "*ought* to be rewarded" (emphasis added), but providing no evidence that Congress believed it was enacting a mandate rather than an authorization and direction to the Secretary to provide for the friendly Sioux. In this vein, the legislative history merely repeats the discretionary language of the statute. *See New England Tank Indus. of N.H. v. United States*, 861 F.2d 685, 694 (Fed.Cir. 1988) ("Will" and "will not" are "mandatory terms" as contrasted to "directory terms" such as "should."); *Cybertech Grp., Inc. v. United States*, 48 Fed.Cl. 638, 649 (2001) ("[I]n everyday discourse, 'shall' is used to denote an affirmative command or obligation

whereas 'should,' by contrast, is used to denote a request or suggestion.").

In short, there is nothing within the legislative history or the structure of the statutes that demonstrates a congressional intent clearly and expressly contrary to the patently discretionary terms ultimately adopted in the text of the Acts. The court thus concludes that the 1863 Acts cannot be read as imposing a specific money-mandating duty upon the government.

### 2. *Fiduciary duty.*

Apart from plaintiffs' contention that the 1863 Acts impose upon the Secretary a money-mandating duty to provide eighty acres of land to plaintiffs, plaintiffs argue also that a "trust relationship [was] created under the ... 1863 Acts ... [which] continues to this day." Pls.' Mot. at 18. The government responds that "[t]he United States has no [f]iduciary [d]uty to [p]laintiffs because the 1863 Acts did not create a [t]rust." Def.'s Mem. at 28.

▮▮▮▮ A statute, or confluence of statutes and regulations, can create a "fiduciary duty [on the part of the government which] can also give rise to a claim for damages within the Tucker Act or Indian Tucker Act." *Samish*, 419 F.3d at 1367 (citing *White Mountain Apache*, 537 U.S. at 473–74, 123 S.Ct. 1126; *United States v. Mitchell*, 463 U.S. 206, 224–26, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*")). Recently, in *United States v. Jicarilla Apache Nation*, the Supreme Court explained further that "[i]n some cases, Congress establishe[s] only a limited trust relationship to serve a narrow purpose." —— U.S. ——, ——, 131 S.Ct. 2313, 2324–25, 180 L.Ed.2d 187 (2011) (citing *Mitchell I*, 445 U.S. at 544, 100 S.Ct. 1349; *United States v. Navajo Nation*, 537 U.S. 488, 507–08, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) ("*Navajo I*")). In other circumstances, Congress can establish full fiduciary obligations on the part of the government. *Jicarilla Apache*, 131 S.Ct. at 2325 (citing *Mitchell II*, 463 U.S. at 226, 103 S.Ct. 2961; *White Mountain Apache*, 537 U.S. at 475,

---

**15.** Senator Harlan's statement was made in response to another Senator's suggestion that the acreage of the potential land grants be reduced from one hundred sixty acres, as provided in the bill then under consideration, to forty acres. Cong. Globe, 37th Cong., 3d Sess. 513–14 (1863).

123 S.Ct. 1126). Full fiduciary obligations, however, are applicable only "*[i]f* a plaintiff identifies ... a [specific rights-creating or duty-imposing statutory or regulatory prescription], and *if* that prescription bears the hallmarks of a 'conventional fiduciary relationship.'" *Navajo II*, 129 S.Ct. at 1558 (internal quotation omitted).[16]

Thus, in *Mitchell II*, a fiduciary relationship was found where the Secretary held a "pervasive role in the sales of timber from Indian lands ... [since] 1910," and numerous, detailed pieces of legislation had been passed and extensive regulations promulgated that governed the Secretary's duty to manage and protect the timber lands and imposed upon the Secretary "full responsibility to manage Indian resources and land for the benefit of the Indians." 463 U.S. at 219–24, 103 S.Ct. 2961. Similarly, in *White Mountain Apache*, the Secretary was required by law to hold the plaintiffs' property "in trust" and the government "ha[d] not merely exercised daily supervision but ha[d] enjoyed daily occupation, and so ha[d] obtained control at least as plenary as its authority over the timber in *Mitchell II*." 537 U.S. at 475, 123 S.Ct. 1126.

■■■ In this case, plaintiffs aver that two entirely discretionary statutes—which were never implemented—established a trust relationship between plaintiffs and the government. Far from the type of specific duty-imposing prescriptions and ongoing fiduciary relations present in *Mitchell II* and *White Mountain Apache*, the 1863 Acts are directory propositions to the Secretary which did not and do not impose upon the Secretary any specific fiduciary obligations that would create a trust relationship between the friendly Sioux and the government.

In sum, the court finds that the 1863 Acts do not establish a trust relationship or impose fiduciary duties upon the government.[17]

### D. *Amendment Based upon an Alleged Taking*

The Robertson–Vadnais Group of plaintiff-intervenors seeks leave to amend its complaint to allege a taking in contravention of the Fifth Amendment. First, they contend that "the United States effected a 5th Amendment 'taking' by failing to provide 'eighty acres in severalty to each individual [Mdewakanton] ... who exerted himself in rescuing the whites' from the 1862 [u]prising" pursuant to the first Act of 1863. Robertson–Vadnais Seventh Amend. Compl. ¶ 225 (ECF No. 929). Second, they allege that the United States effected a taking of their property interest in the twelve sections of land identified in 1865 through the public sale of that land in 1867. Robertson–Vadnais Mem. in Support of Partial Summ. J. ("Robertson–Vadnais Mem.") at 33 (ECF No. 1001). The government responds that any such alleged takings claims "first accrued more than six years before [plaintiff-intervenors] filed their complaint and the claim is thus [time-]barred." Def.'s Mem. at 54. Additionally, the government avers that the plaintiff-intervenors do not "possess [a] compensable property interest arising from the February 1863 Act," and that the government's failure to provide land cannot form the basis of a legally cognizable takings claim. *Id.* at 58.

■■■ Fifth Amendment takings claims are within the jurisdiction of this court under the Tucker Act, 28 U.S.C. § 1491, *Boling v. United States*, 220 F.3d 1365, 1370 (Fed.Cir. 2000), and thus also under the Indian Tucker Act. However, suits against the United States brought in this court under these Acts

---

**16.** In *Navajo II*, the Court explained in more detail the requisites a plaintiff must satisfy to establish jurisdiction under the Indian Tucker Act. First, the plaintiff "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the [g]overnment has failed faithfully to perform those duties." 129 S.Ct. at 1552 (internal quotation marks and citation omitted). If the plaintiff overcomes that first hurdle, "the court must then determine whether the relevant source of substantive law can fairly be interpreted as mandat-

ing compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Id.* (internal quotation marks and citation omitted).

**17.** For these reasons, the court finds unpersuasive the DuMarce Group of plaintiff-intervenors' contention that the 1863 Acts serve as enabling acts which create a trust relationship in conjunction with the Appropriations Acts. DuMarce Fourth Amend. Compl. ¶ 42 (ECF No. 930).

must be filed within six years after accrual of the cause of action. 28 U.S.C. § 2501. Because this statute of limitations circumscribes the scope of the government's waiver of sovereign immunity, it is "jurisdictional" in nature. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988). Accordingly, the limitations period is not subject to equitable tolling or implied exceptions. *See John R. Sand*, 552 U.S. at 133–34, 128 S.Ct. 750. Plaintiff-intervenors must meet this jurisdictional burden by demonstrating by a preponderance of the evidence that their claim was timely filed. *See Taylor v. United States*, 303 F.3d 1357, 1359 (Fed.Cir.2002).

 "A claim accrues 'when all the events have occurred which fix the liability of the [g]overnment and entitle the claimant to institute an action.'" *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed.Cir.2006) (quoting *Hopland Band*, 855 F.2d at 1577). In the context of the Fifth Amendment, "the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken." *Boling*, 220 F.3d at 1370; *Goodrich*, 434 F.3d at 1333 (A Fifth Amendment claim accrues "'when th[e] taking action occurs.'" (quoting *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed.Cir.1994))). In this regard, the "proper focus, for statute of limitations purposes, 'is upon the time of the [government's] *acts*, not upon the time at which the *consequences* of the acts became most painful.'" *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed.Cir.1995) (quoting *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). However, "the claim only accrues if the claimant 'knew or should have known' that the claim existed." *Goodrich*, 434 F.3d at 1333 (quoting *Kinsey v. United States*, 852 F.2d 556, 557 n. * (Fed.Cir.1988)).

 Plaintiff-intervenors' contention based upon the government's failure to provide land matured in 1867—the year in which plaintiff-intervenors contend the United States began to fail to provide lands under the Act. Robertson–Vadnais Mem. at 34 ("The United States, *since the 1867 original taking*, continues to hold the Mdewakanton 'inheritable beneficial interest,' constituting a continuing taking, by withholding Plaintiff[-Intervenors'] cognizable property interests under the February 1863 Act without just cause of reason.") (emphasis added).

Likewise, plaintiff-intervenors' second takings claim, based upon the twelve sections of land, accrued in 1867. It was in that year that the land was authorized to be publicly sold by President Johnson's proclamation. *See, e.g., Alliance of Descendants*, 37 F.3d at 1482 (takings claim, which alleged taking of a cause of action for land, accrued with passage of treaty releasing United States from all claims regarding such land). At the very latest, the takings claim would have accrued upon the government's actual sale of the land and issuance of land patents to the buyers of the twelve sections of land. *See Voisin v. United States*, 80 Fed.Cl. 164, 170–71 (2008) (government's issuance of land patents for plaintiffs' land and subsequent sale of land pursuant to legislation marked date of accrual of takings claim). Plaintiffs have provided evidence that those sales took place between 1871 and 1895. *See* Pls.' Mem. at 9 n. 31 (citing Pls.' App. 287–330 (Redwood and Renville City Land Patents, 1871–95)).

Thus, in 1867, or, construed most generously, by 1895, plaintiff-intervenors' alleged property interests in a land expectancy under the 1863 Acts had been taken. *See Fallini*, 56 F.3d at 1380 ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."). Accordingly, the filing of the complaint in this case on November 18, 2003, falls far outside of the six-year statute of limitations.

Nevertheless, plaintiff-intervenors "join in the Wolfchild [p]laintiffs' ... arguments in support of their claim that the ... statute of limitations ... is inapplicable." Robertson–Vadnais Mem. at 37.[18] Plaintiffs' statute-of-

---

18. Plaintiff-intervenors state also that the takings claim is not untimely under 28 U.S.C. § 2415

limitations arguments rely on: (1) the continuing claims doctrine; (2) the Indian Trust Accounting Statute, Pub.L. No. 108–108, 117 Stat. 1241, 1263 (2003); and (3) the provision of 28 U.S.C. § 2501 allowing for the tolling of the limitations period for persons under legal disability. Pls.' Mem. at 36–39.

The continuing claims doctrine applies "where a plaintiff's claim is 'inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.'" *Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1145 (Fed.Cir.2008) (quoting *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed.Cir. 1997)). The doctrine does not apply, however, where "a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach." *Boling*, 220 F.3d at 1373.

Plaintiff-intervenors' takings claims do not fall within the ambit of the continuing claims doctrine. The purported takings were accomplished by governmental action—and, in plaintiff-intervenors' view, inaction—during the Nineteenth Century. Those alleged takings do not renew or replicate each day or with each physical incursion upon the twelve sections of land. *See, e.g., Boling*, 220 F.3d at 1373–74 (taking accrued on date erosion from waterway substantially encroached on plaintiffs' property and claims did not renew with each quantum of erosion damage to plaintiffs' property); *Fallini*, 56 F.3d at 1382–83 (taking via legislation that prevented plaintiffs from disallowing wild horses and burros to drink plaintiffs' water did not renew with "every drink by every wild horse"); *Voisin*, 80 Fed.Cl. at 172, 176–77 (refusing to apply continuing claims doctrine, in similar circumstances, where plaintiffs alleged that the United States' "continued and repeated refusal to recognize [plaintiffs] as the rightful owners of [the disputed parcel] should be considered a continuing wrong").

Nor does the Indian Trust Accounting Statute assist plaintiff-intervenors. The version of that statute in place at the time of the filing of plaintiffs' initial complaint provided:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

117 Stat. at 1263. In *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1348–50 (Fed.Cir. 2004), the Federal Circuit emphasized that the Indian Trust Accounting Statute applies only to trust funds and does not toll claims for breach of fiduciary duties regarding trust assets. *See also Rosales v. United States*, 89 Fed.Cl. 565, 580 (2009) (Indian Trust Accounting Statute did not apply to claims of breach of fiduciary duty where plaintiffs claimed they were rightful beneficial owners of parcels of land held in trust by government for Indian tribe); *Simmons v. United States*, 71 Fed.Cl. 188, 193 (2006) (Indian Trust Accounting Statute did not apply to a claim for breach of fiduciary duty for government mismanagement of timber assets). Plaintiff-intervenors' reliance on the Indian Trust Accounting Statute is thus unavailing. Their claims center on parcels of land—not on trust *funds*—and the court has already found that the 1863 Acts did not create a trust relationship or impose upon the government fiduciary duties; thus, there is nothing held in trust under the 1863 Acts to which the Indian Trust Accounting Statute could apply.

Plaintiff-intervenors' final contention, that the claims should be tolled for minors, is dealt with much in the same way it was first rejected by this court in *Wolfchild I*. As the court noted, the pertinent statute of

because "[p]laintiff[-intervenors] did not receive any notice or opportunity to be heard pursuant to th[at] statute." Robertson–Vadnais Mem. at 37. Section 2415 provides the statute of limita-

tions for actions for money damages brought by the United States and has no bearing on this case.

limitations, 28 U.S.C. § 2501, "treats children as if they were legally unable to file suit and allows filing within three years after a child reaches majority status." 62 Fed.Cl. at 549. Eighteen years is the age of majority in Minnesota. *See* Minn.Stat. § 645.451. The alleged takings in this case accrued in the Nineteenth Century. The minors' takings claims are thus time-barred as well.

### E. *Synopsis*

In sum, the court concludes that plaintiffs lack standing to bring a claim based upon the Non–Intercourse Act because they are not a "tribe" within the meaning of the Act. Plaintiffs also lack any claim grounded in the 1863 Acts because those Acts do not impose a money-mandating duty upon the government nor do they create specific fiduciary obligations giving rise to a trust relationship between plaintiffs and the government. The Robertson–Vadnais Group of plaintiff-intervenors' takings claim fails because it falls outside this court's statute of limitations.

These defects of the proposed amendments are jurisdictional in nature; the particular claims at issue would not withstand a motion to dismiss. Accordingly, plaintiffs and plaintiff-intervenors' motions to amend must be denied in relevant part for futility. *See Kemin Foods,* 464 F.3d at 1354–55; *Webster,* 74 Fed.Cl. at 444; *Shoshone Indian Tribe,* 71 Fed.Cl. at 176. In other respects the proposed amendments are allowed. The government's motion to dismiss claims based upon the 1863 Acts is granted as to the Julia DuMarce Group and the Harley Zephier Group of plaintiff-intervenors, which groups were granted leave to amend their complaints to include claims based upon the 1863 Acts in the court's opinion in *Wolfchild VII.* See 96 Fed.Cl. at 335–36.

## II. MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO DEFER CONSIDERATION PURSUANT TO RULE 56(f)

The question of claimant eligibility has permeated this case from its inception. While identification of proper plaintiffs is expected to be a source of some contention in a case of this nature, the government's erratic positions as to this issue have exacerbated the matter.

At a status conference held on January 21, 2011, the parties agreed on a schedule for a final resolution of this case, which schedule included, among other things, the requirement that plaintiffs and plaintiff-intervenors submit documentation in support of their motions for summary judgment regarding claimant eligibility. *See* Scheduling Order, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. Jan. 21, 2011), ECF No. 843. As contemplated by the parties' discussions during the status conference and pursuant to that schedule, plaintiffs and plaintiff-intervenors have filed proposed findings of uncontroverted facts and motions for summary judgment regarding the determination of eligible claimants and have submitted attendant to those motions almost 150,000 pages of documentary exhibits. *See* Def.'s Rule 56(d) Mot. at 3. Plaintiffs rely on these documents and a declaration submitted by Dr. Barbara Buttes to contend that they have satisfied the preponderance-of-the-evidence standard for eligibility and that "[t]here are no disputed material facts" precluding summary judgment in their favor. Pls.' Mot. at 32–33; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (party moving for summary judgment must demonstrate the absence of any genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (A material fact is one "that might affect the outcome of the suit under the governing law," and a genuine dispute is one that "may reasonably be resolved in favor of either party.").

In response to plaintiffs' motions, the government filed a motion to defer consideration under RCFC 56(d).[19] Rule 56(d) provides that "[i]f a nonmovant [for summary judgment] shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may ... allow time to obtain affidavits or

---

19. Prior to the court's amendments to the Rules of the Court of Federal Claims which became effective on July 15, 2011, similar language appeared in RCFC 56(f). The government's motion was filed prior to July 15, 2011, and refers to RCFC 56(f).

declarations or to take discovery." RCFC 56(d)(2); *see also Brubaker Amusement Co. v. United States,* 304 F.3d 1349, 1361 (Fed. Cir.2002). Such a motion must articulate "with particularity, what facts the movant hopes to obtain by discovery and how these facts will raise a genuine issue of fact." *Exigent Tech., Inc. v. Atrana Solutions, Inc.,* 442 F.3d 1301, 1310 (Fed.Cir.2006).

In its motion under Rule 56(d), the government resurrected its contention, which position was rejected by this court in *Wolfchild I,* that "[p]laintiffs are not a group of identifiable Indians." Def.'s Rule 56(d) Mot. at 1; *id.* at 5 ("This lawsuit is not in the name of an Indian Tribe or an identifiable group of Indians."). Concurrently, the government requested that the "[c]ourt determine that [the government] need not respond to [p]laintiffs' [p]roposed [f]indings of [u]ncontroverted [f]act until such time as the eligibility criteria for any claimants are established and [the government] has had time to conduct any additional and necessary discovery related to those criteria." *Id.* at 9. As cause for its motion, the government stated that "the [c]ourt has not yet defined the requirements and standards it intends to use to evaluate the [p]laintiffs' individual eligibility for any disbursement," *id.* at 1, and it "specifically aver[red] that it await[ed] the adjudication and a determination of which criteria define an eligible claimant." *Id.* at 8. It thus represented that "[a]ny additional factual discovery would directly relate to the eligibility criteria set forth by the [c]ourt." *Id.*[20] In tension with these arguments, however, it contended that "[d]etermination of which individual [p]laintiffs or [i]ntervening-[p]laintiffs are eligible to participate in any distribution of funds as a result of the [c]ourt[']s December 21, 2010[ ] [o]rder ... is not necessary for the entry of final judgment." *Id.* at 2 (citation omitted). Then, in its reply to plaintiffs' response in opposition to the 56(d) motion, the government again averred that "[t]he United States seeks relief pursuant to RCFC 56( [d] ) because it *requires addition-al time to determine which individual plaintiffs or intervening plaintiffs are eligible to participate in any distribution of funds as a result of the [c]ourt's December 21, 2010[ ] [o]rder."* Def.'s Rule 56(d) Reply at 1 (emphasis added).

In a Joint Status Report filed May 27, 2011, however, the government retreated entirely from its Rule 56(d) motion and, indeed, from nearly all of its prior positions regarding the appropriate procedure to determine claimant eligibility. In that report, the government asserted for the first time that the Indian Judgment Distribution Act, 25 U.S.C. §§ 1401–1408, applies here because the court has determined that the plaintiffs are an identifiable group of American Indians, and "[c]onsistent with that finding, the [g]overnment believes that [p]laintiffs are, therefore, also a 'group' under the [Distribution Act]." Joint Status Report at 10, *Wolfchild v. United States,* No. 03–2684 (Fed.Cl. filed May 27, 2011), ECF No. 1076 ("Joint Status Report"). The government "request[ed] that the [c]ourt define those who may share in any award premised on the Appropriations Acts," and asked the court to "find the McLeod and Henton census rolls to be comprehensively and exclusively correct, such that a [plaintiff] must prove by a preponderance that they descend from a person ... on those rolls." *Id.* at 8, 9; *see also* Def.'s Mot. at 61 ("The McLeod and Henton censuses were created for the purpose of identifying those Indians entitled to the benefits of the Appropriations Acts, and this [c]ourt should accept them as correct and dispositive."). It claimed, however, that any distribution following such a determination by the court "must be accomplished according to the requirements of the [Distribution Act]." Joint Status Report at 10.

At that point, the court requested that the parties submit supplemental briefs addressing the following three questions:

1) Does Chapter 16 of Title 25 of the United States Code, 25 U.S.C. §§ 1401–

---

**20.** In its Rule 56(d) motion, the government also urged the court to defer consideration of plaintiffs' and intervening-plaintiffs' claims of eligibility as to the 1863 Acts until the court determines "whether the 1863 Acts give rise to a money-mandating duty." Def.'s Rule 56(d) Mot. at 7. The court's determination that plaintiff and plaintiff-intervenors lack any viable claim grounded in the 1863 Acts renders moot this portion of the government's motion.

08, apply to a money judgment that is entered and subject to payment under 28 U.S.C. § 2517 and 31 U.S.C. § 1304?

2) If Chapter 16 of Title 26 does not apply to such a money judgment, can and should a distribution plan nonetheless follow and reflect the plan provisions set out in Chapter 16?

3) If Chapter 16 of Title 25 does apply to such a money judgment, what is the court's role in ensuring that the distribution plan accords with the judgment that is entered?

Order of June 3, 2011, ECF No. 1083.[21]

In response to the court's request for supplemental briefing, the government undertook a further *volte face* in its supplemental brief filed on June 17, 2011. Although the government reiterated its contention that the Distribution Act applies to any judgment that may be issued in this case, it altered once more its position as to this court's proper role in determining claimant eligibility. The government avers now that "even asking this [c]ourt to make a determination about the import or extent of certain census rolls is inappropriate" because "[t]o do so would operate to summarily exclude certain classes of potential participants before they could be heard in the exclusive forum and [pursuant

to] processes provided by Congress to resolve such issues under the Act." Def.'s Supplemental Br. at 16. The court accordingly turns to the Indian Judgment Tribal Fund Use or Distribution Act before proceeding to address the eligible-claimant cross-motions.

### A. The Indian Judgment Tribal Fund Use or Distribution Act

Enacted on October 19, 1973, the Indian Judgment Tribal Fund Use or Distribution Act, Pub.L. No. 93–134, 87 Stat. 466, 466–68 (codified as amended at 25 U.S.C. §§ 1401–08) provides, in relevant part:

> Within one year after appropriation of funds to pay a judgment of the Indian Claims Commission or the United States Court of Federal Claims to any Indian tribe, the Secretary of the Interior shall prepare and submit to Congress a plan for the use and distribution of the funds. Such plan shall include identification of the present-day beneficiaries, a formula for the division of the funds among two or more beneficiary entities if such is warranted, and a proposal for the use or distribution of the funds.

25 U.S.C. § 1402(a).[22] The impetus for the Act was described in the House Report attendant to the legislation:

> (C) under a decision of a board of contract appeals; or
> (D) in excess of an amount payable from the appropriations of an agency for a meritorious claim under section 2733 or 2734 of title 10, section 715 of title 32, or section 20113 of title 51.

31 U.S.C. § 1304(a) (emphasis added).

**21.** The manner and means of paying judgments of this court are provided by 28 U.S.C. § 2517, which states in pertinent part:

(a) Except as provided by chapter 71 of title 41, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefore, on presentation to the Secretary of the Treasury of a certification of the judgment by the clerk and chief judge of the court.

28 U.S.C. § 2517(a). In turn, appropriations to pay such judgments are provided via 31 U.S.C. § 1304, which states:

(a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—

(1) payment is not otherwise provided for;

(2) payment is certified by the Secretary of the Treasury; and

(3) the judgment, award, or settlement is payable—

(A) *under section* 2414, 2517, 2672, or 2677 of *title 28;*

(B) under section 3723 of this title;

**22.** The Act sets forth detailed guidelines for preparation of a distribution plan. It delineates factors the Secretary must consider in formulating the plan, mandates that the Secretary provide a hearing of record after public notice to the affected tribe or group, and requires Interior to make its "legal, financial, and other expertise ... fully available in an advisory capacity to the [affected] Indian Tribe [or group] ... to assist it [in] develop[ing] and communicat[ing] to the Secretary ... its own suggested plan for the distribution and use of such funds." 25 U.S.C. §§ 1403(a), (b).

As addressed in detail, *infra,* at 89–91, a previously-existing requirement, codified at 25 U.S.C. §§ 1402(a), 1404, that the Secretary submit such a distribution plan to Congress for its review and potential disapproval has been superseded by subsequent law.

Funds appropriated to satisfy judgments of the Indian Claims Commission or the Court of Claims on behalf of Indian plaintiffs are deposited in the United States Treasury to the credit of the plaintiff tribe. Prior to 1960, under an opinion of the Interior Solicitor, these funds were distributed by the Secretary of the Interior without further Congressional action.

Since 1960, each Interior Department Appropriation Act has included the following proviso:

*Provided further,* That nothing contained in this paragraph or in any other provision of law shall be construed to authorize the expenditure of funds derived from appropriations in satisfaction of awards of the Indian Claims Commission or the Court of Claims, ... until after legislation has been enacted that sets forth the purposes for which said funds will be used....

H.R.Rep. No. 93–377, at 4 (1973), 1973 U.S.C.C.A.N. 2311, 2313. The requirement of further legislative action to approve a distribution was "impos[ing] a severe burden upon the time and efforts of Members of the Committee on Interior and Insular affairs" and distracting its attention from other issues. *Id.* at 4–5. Additionally, the process of enacting legislation for each distribution of funds "caused long delays, in some cases, over several years after judgments [had] been awarded until their distribution." S.Rep. No. 93–167, at 2 (1973). The purpose of the Distribution Act was to ameliorate this situation by "provid[ing] for the use or distribution of Indian judgment funds appropriated in satisfaction of awards of the Indian Claims Commission and the Court of Claims without further legislation." H.R.Rep. No. 93–377, at 3, 1973 U.S.C.C.A.N. 2311 at 2312.

Subsection 1401(a) of Title 25 defines the scope of the Indian Judgment Distribution Act and is the focal point of the court's inquiry. It provides:

Notwithstanding any other law, all use or distribution of funds appropriated in satisfaction of a judgment of the Indian Claims Commission or the United States Court of Federal Claims in favor of any Indian tribe, band, group, pueblo, or community (hereinafter referred to as "Indian tribe") ... shall be made pursuant to the provisions of this chapter.

25 U.S.C. § 1401(a). Plaintiffs and plaintiff-intervenors object to application of the Indian Judgment Distribution Act to this case. They contend that the Act "only applies if the party plaintiff is an entity and not specifically[-]named individuals." Pls.' Supplemental Br. at 2–3. Because plaintiffs and plaintiffs-intervenors are named individuals, they argue the Act does not encompass this case. *Id.; see also* Pl.-Intervenors' Supplemental Br. at 6–7. Plaintiffs also aver that the Act "does not apply until Congress has actually appropriated funds to pay a [Court of Federal Claims] judgment separate and apart from funding via 28 U.S.C. §˙2517 and 31 U.S.C. § 1304." Pls.' Supplemental Br. at 4. Plaintiffs thus urge that "because no separate, specific appropriation has been enacted satisfying a ... judgment in ... [p]laintiffs' favor," the Act does not apply. *Id.*

The government argues that the Act applies because the court has already determined that "[p]laintiffs [in this case] constitute an 'identifiable group of Indians' for purposes of exercising jurisdiction under 28 U.S.C. § 1505." Joint Status Report at 10 (quoting *Wolfchild I,* 62 Fed.Cl. at 539); *see also* Def.'s Supplemental Br. at 1. It contends also that the Act applies to any money judgment issued from this court, whether that judgment is satisfied pursuant 28 U.S.C. § 2517 and 31 U.S.C. § 1304 or by a separate appropriation from Congress. Def.'s Supplemental Br. at 7.

1. *An Indian "group."*

As noted, the court has determined and reaffirmed multiple times that plaintiffs are "an identifiable group of American Indians." *Wolfchild I,* 62 Fed.Cl. at 540; *see also id.* at 540 ("[P]laintiffs bring their claims specifically and solely as members of a group."); *Wolfchild VII,* 96 Fed.Cl. at 338 ("The loyal Mdewakanton are an 'identifiable group of American Indians' within the meaning of the [Indian Tucker] Act."). Plaintiffs contend, however, that the court's classification of plaintiffs under the Indian Tucker Act does not mean that plaintiffs are a "group" within

the meaning of the Indian Judgment Distribution Act because the latter "does not ... mention the Indian Tucker Act" and because "group" as used in the Distribution Act encompasses only singular Indian entities, not judgments in favor of named individuals. Pls.' Supplemental Br. at 2–3.

The Indian Judgment Distribution Act does not define the term "group." The regulations implementing the Act provide, however, that *"Indian tribe or group means any Indian tribe, nation, band, pueblo, community or identifiable group of Indians,* or Alaska Native entity." 25 C.F.R. § 87.1(g) (emphasis added). Subsection (g) of this regulation indisputably encompasses the plaintiffs in this case. Importantly, the Department of the Interior's interpretation of the Distribution Act reflected in this regulation is amply supported by the statutory regime and history governing Indian claims in this court.

 Where, as here, the text of a statute does not furnish a definitive answer, reference to context, legislative history, and canons of statutory construction is warranted. *See Bull v. United States,* 479 F.3d 1365, 1376 (Fed.Cir.2007); *Timex V.I. v. United States,* 157 F.3d 879, 882 (Fed.Cir.1998). Of particular relevance in this case, the *in pari materia* canon of construction dictates that "statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank v. Schmidt,* 546 U.S. 303, 315–16, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006) (quoting *Erlenbaugh v. United States,* 409 U.S. 239, 243, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972)) (internal quotation marks omitted); *see also Strategic Housing Fin. Corp. of Travis Cnty. v. United States,* 608 F.3d 1317, 1330 (Fed.Cir.2010) ("Under [the *in pari materia* ] canon, courts should interpret statutes with similar language that generally address the same subject matter together, as if they were one law.") (internal quotation marks omitted).

 Although the Indian Tucker Act is a jurisdictional grant to the Court of Federal Claims, and the Distribution Act governs the administration of certain judgments from the Court of Federal Claims (and, formerly, the Indian Claims Commission), the relationship between the two statutes favors application

of the *in pari materia* canon. As described below, presently, the Indian Tucker Act serves as the only jurisdictional avenue by which a judgment falling within the terms of the Distribution Act may be created. In this context, the court finds it improbable that Congress intended "group" as used in the Distribution Act to have a meaning entirely exclusive of the term "identifiable group" in the Indian Tucker Act.

The court is persuaded as well by the parallel structure of the jurisdictional grant to the Indian Claims Commission. The Indian Tucker Act, passed in its original form in 1949, adopted language nearly identical to that used in the grant of jurisdiction to the Indian Claims Commission, created three years earlier. *Compare* Act of May 24, 1949, ch. 139, § 89(a), 63 Stat. 89, 102 (codified as amended at 28 U.S.C. § 1505) (granting jurisdiction to the Court of Claims over claims against the United States accruing after August 13, 1946 "in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska"), *with* Indian Claims Commission Act, Act of Aug. 13, 1946, § 2, 60 Stat. 1049, 1050 (granting jurisdiction to the Claims Commission over claims against the United States by "any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska"). Early on, the Court of Claims recognized that there was a distinction between the term "tribe" and "group" under the Indian Claims Commission Act. *See McGhee v. Creek Nation,* 122 Ct.Cl. 380 (1952). In this regard, the Court of Claims stated:

> To identify is to establish the identity of, and if a group presenting a claim under the Act is capable of being identified as a group of Indians consisting of the descendants of members of the tribes or bands which existed at the time the claim arose, the jurisdictional requirements of the status, in our opinion, have been met. It would ... be a strained and unwarranted interpretation of the Act to say that Congress intended by the term 'identifiable group' that the group making the claim must be identical, as a distinct entity, with

the tribe or band existing at the time the claim arose. Such interpretation would make the term 'identifiable group' mean nothing more than a recognized tribe or band.

*Id.* at 391–92; *see also Thompson v. United States*, 122 Ct.Cl. 348, 360 (1952) ("Congress intended to enlarge [beyond 'recognized tribes or bands'] the category of groups of Indians entitled to present claims for hearing and determination when it added the words 'or other identifiable groups,' not theretofore customarily used.").

The court's reading of the language within the Indian Claims Commission Act naturally carried over into the Indian Tucker Act as well, *see Tee–Hit–Ton Indians v. United States*, 120 F.Supp. 202, 204 (Ct.Cl.1954), *aff'd*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955),[23] and persists to the present day, *see Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States*, 69 Fed.Cl. 639, 670–71 (2006). In 1976, the Indian Claims Commission was abolished, at which point Congress instructed the Commission to "transfer [all cases] to the Court of Claims" and granted jurisdiction to the Court of Claims over those cases previously heard by the Commission. *See* Pub.L. No. 94–465, § 23, 90 Stat. 1990 (1976).

Thus, when the Indian Judgment Distribution Act was enacted in 1973, the only judgments that could have potentially fallen within the scope of the Distribution Act would have been those from the Court of Claims or the Indian Claims Commission in favor of a "tribe, band, or other identifiable group of American Indians," with the latter phrase carrying the precise meaning it does today, that is, an aggregation of identifiable American Indians but not necessarily a singular entity. The Distribution Act encompasses judgments in favor of "any Indian tribe, band, group, pueblo, or community." 25 U.S.C. § 1401(a). It would be strange indeed if the term "group" as used in that Act included only singular Indian entities besides those known as tribes and bands, when the

two jurisdictional statutes which could produce judgments within the scope of the Distribution Act encompassed only judgments in favor of "identifiable group[s] of American Indians," besides those known as tribes and bands. 28 U.S.C. § 1505; 60 Stat. at 1050. The only reading of the Distribution Act which does not logically necessitate finding that an "identifiable group" under the Indian Tucker Act qualifies as a "group" under the Distribution Act is one which gives the term "group" as used in the Distribution Act a technical meaning amounting essentially to a federally-recognized entity; yet, pertinent regulations governing Indian recognition defy such a reading.

The Department of the Interior's regulations governing federal acknowledgement of Indian associations define an "Indian group or group" as "any Indian or Alaska Native aggregation within the continental United States that the Secretary of the Interior does not acknowledge to be an Indian tribe." 25 C.F.R. § 83.1. The regulations explicitly distinguish such a "group" from federally-acknowledged aggregations of Indians, which may be recognized as "tribes, organized bands, pueblos, Alaska Native villages, or communities." 25 C.F.R. § 83.3(b). The Department of the Interior's regulations thus show that to the extent the term Indian "group" may have a particular meaning within the legislative or regulatory context, the term does not equate to a recognized, singular Indian entity but rather encompasses aggregations of Indians.

Furthermore, the legislative history of the Indian Judgment Distribution Act disfavors plaintiffs' position. Section 4 of Senate Bill 1016, the legislative predecessor to the Act, provided:

Within six months after the date of the appropriation of funds by the Congress to pay each Indian judgment, the Secretary of the Interior ... shall prepare and submit to the Congress a recommended plan for the distribution of such funds ... to *the*

---

**23.** Notably, although the Court of Claims' finding that plaintiffs constituted an "identifiable group" under 28 U.S.C. § 1505 was not a disputed issue on appeal to the Supreme Court, the Supreme Court observed that the claimants in *Tee–Hit–Ton* were "an identifiable group of American Indians of between 60 and 70 individuals residing in Alaska." *Tee–Hit–Ton*, 348 U.S. at 273, 75 S.Ct. 313.

*Indian tribe, band, group, pueblo, or community in whose favor such judgment is rendered and such funds appropriated.*

*Hearing Before the Subcomm. on Indian Affairs of the Comm. on Interior and Insular Affairs: First Session on S. 1016,* 93d Cong. 5–6 (1973) ("Hearing on S. 1016") (S. 1016, 93d Cong. (1973)) (emphasis added). After Congress solicited the views of the Department of Interior on the proposed legislation, the Assistant Secretary of the Interior objected to the emphasized language, noting that "the beneficiaries of an award are *often individuals,* for example, *the persons listed on a given roll." Id.* at 12, 14 (Letter from John H. Kyl, Assistant Secretary of the Interior, to Sen. Henry Jackson (Apr. 12, 1973)) (emphasis added). The Assistant Secretary recommended the deletion of any language insinuating judgments were rendered or funds appropriated in favor of Indian tribes, bands, groups, pueblos, or communities. *Id.* at 14. Congress obliged, and that portion of Section 4 of Senate Bill 1016, along with similar language, was struck from the bill. *See* 93 Cong. Rec. 33,180 (1973) (statement of Sen. Jackson) ("At the time this measure was considered before the full committee, all of the Department's clarifying amendments were approved...."); 93 Cong. Rec. 16,375–76 (1973) (enacting relevant amendments to S. 1016).

Congress' alteration of the provision of the Distribution Act providing for public hearings of record on a proposed distribution plan is similarly instructive. Section 4(c)(2) of Senate Bill 1016 required the Secretary to "hold a hearing or hearings of record, after appropriate public notice, to obtain the testimony of leaders and members of the Indian tribe, band, group, pueblo, or community and any individual who may receive any portion, or be affected by the distribution, of such funds." Hearing on S. 1016 at 7. Here also, the Assistant Secretary objected, noting that "[b]ecause of the fact that many judgments involve *entities which are comprised solely of individual descendants,* sometimes numbering in the thousands ... to guarantee that all individuals' views be heard in public hearings, as section 4(c)(2) contemplates, would be impossible, even with respect to smaller, organized tribes.... Accordingly, we recommend that the words 'and any individual' ... be deleted." *Id.* at 15. Those words were struck from the bill, and 25 U.S.C. § 1403(a)(2) instead requires the Secretary to hold a public hearing "to obtain the testimony of leaders and members of the Indian tribe which may receive any portion, or be affected by the use of distribution, of such funds."

This series of events demonstrates that Congress understood that the Indian Judgment Distribution Act was to encompass judgments in favor of aggregations of individual Indians, and not just singular entities. And indeed, other provisions of the Indian Judgment Distribution Act make sense only with this understanding of the Act. For example, 25 U.S.C. § 1403(a) requires that the Secretary "prepare a plan which shall best serve the interest of all those entities *and individuals* entitled to receive funds of each Indian judgment." (Emphasis added.) In this same vein, 25 U.S.C. § 1403(b)(2) mandates that the Secretary assure that "the needs and desires of any groups *or individuals* who are in a minority position, but who are also entitled to receive such funds, have been fully ascertained and considered." (emphasis added); *see also* 25 U.S.C. § 1404(2) (requiring the Secretary to submit to Congress "a statement of the extent to which such plan reflects the desire of the Indian tribe *or individuals* which are entitled to such funds") (emphasis added).

Nevertheless, plaintiffs and plaintiff-intervenors rely on *Short v. United States,* 12 Cl.Ct. 36 (1987), in arguing that the Distribution Act does not apply. *See* Pls.' Supplemental Br. at 2. Plaintiffs contend that *Short* "held that 25 [U.S.C.] § 1401 did not apply because the judgment was issued in favor of individual Indian class beneficiaries." Pls.' Supplemental Br. at 3. *Short,* however, is inapposite to the present case.

In contrast to this case, in *Short* the Claims Court found jurisdiction under the Tucker Act, 28 U.S.C. § 1491, not the Indian Tucker Act, 28 U.S.C. § 1505. *See Short,* 12 Cl.Ct. at 40 ("[P]laintiffs are suing as individuals under 28 U.S.C. § 1491 (1982)."). Later, "[i]n 1989, the Claims Court *denied* the

plaintiffs' claim for *group damages* under 28 U.S.C. § 1505." *Short v. United States*, 50 F.3d 994, 997 (Fed.Cir.1995) (emphasis added) (citing Order at 3–10, *Short v. United States*, No. 102–63 (Cl.Ct. July 25, 1989)). The court also refused the government's request to substitute a tribal entity for the individually-named plaintiffs and to apply the Distribution Act to the judgment because "there [was] no functioning . . . tribal organization," and "substitution of such a nonfunctioning entity" would impair prompt resolution of the case. *Short v. United States*, 661 F.2d 150, 155 (Ct.Cl.1981).[24]

Although this case bears a similarity to *Short* in that plaintiffs are not suing as part of a federally-recognized entity, the plaintiffs are an identifiable group. At a minimum, the lineal descendants of the loyal Mdewakanton are identifiable under the terms of the Appropriations Acts and the two censuses. *See, e.g., Chippewa Cree Tribe*, 69 Fed.Cl. at 670–74 (holding that beneficiaries of judgment fund constituted an identifiable group where beneficiary class was defined by statute and rolls prepared by the Secretary of Interior); *Peoria Tribe of Indians of Okla. v. United States*, 169 Ct.Cl. 1009, 1012–13 (1965) (finding that identification of two scattered families descended from an Indian nation was sufficient to support Claims Commission's determination that plaintiffs constituted an identifiable group); *Thompson v. United States*, 122 Ct. Cl. 348, 360 (1952) (holding that Indians of California could bring suit as identifiable group despite lack of formal tribal organization). What is more, plaintiffs assert a collective interest in the lands and funds resulting from the Appropriations Acts. *See, e.g., Tee–Hit–Ton Indians*, 120 F.Supp. at 204 (holding that individuals representing the plaintiff clan constituted an identifiable group where "land . . . was claimed by the plaintiff clan as a whole").

For these reasons, the court finds that plaintiffs and plaintiff-intervenors are indeed an "identifiable group" under the Indian Tucker Act, and thus, a "group" within the meaning of the Indian Judgment Distribution Act.

### 2. *"Funds appropriated in satisfaction of a judgment."*

Plaintiffs aver that the Distribution Act "does not apply until Congress has actually appropriated funds to pay a [Court of Federal Claims] judgment separate and apart from funding via 28 U.S.C. § 2517 and 31 U.S.C. § 1304." Pls.' Supplemental Br. at 4. Plaintiffs contend that "the government's [position] is based on a contingency—that Congress would actually enact, in the future, a specific claims distribution act for the [plaintiffs]." *Id.* The government responds that no separate appropriation is necessary to trigger application of the Distribution Act because 28 U.S.C. § 2517 and 31 U.S.C. § 1304 provide the exclusive statutory mechanism for Congressional funding of this court's judgments. *See* Def.'s Supplemental Br. at 7.

The Indian Judgment Distribution Act applies, "[n]otwithstanding any other law, [to] all use or distribution of funds appropriated in satisfaction of a judgment of the . . . United States Court of Federal Claims in favor of any Indian tribe, band, group, pueblo, or community." 25 U.S.C. § 1401(a). In isolation, the statutory text does not make obvious whether the Act applies only to funds specifically appropriated by separate legislation to satisfy Court of Federal Claims' judgments in favor of Indians, or whether it applies to funds derived from the general

---

**24.** Decisions rendered in the *Short* litigation must be viewed in light of that case's particular and peculiar history. The *Short* litigation spanned nearly forty years, and eventually gave way to Congressional intervention, namely, the 1988 Hoopa–Yurok Settlement Act, 25 U.S.C. §§ 1300i to 1300i–11 (1994). That Act "nullified the *Short* rulings [*Short v. United States*, 486 F.2d 561 (Ct.Cl.1973); *Short v. United States*, 661 F.2d 150 (Ct.Cl.1981); *Short v. United States*, 719 F.2d 1133 (Fed.Cir.1983)], by establishing a new

Hoopa Valley Reservation." *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1372 (Fed.Cir.2000).

Additionally, avoidance of the Distribution Act did not turn out to provide the relatively rapid distribution of judgment funds that the *Short* court expected; a final order directing the entry of judgments was not filed until 1993, thirty years after the initial decision on liability was issued. *See* Final Order Directing Entry of Judgments, *Short v. United States*, No. 63–102 (Fed. Cl. July 29, 1993), ECF No. 3.

appropriation known as the Judgment Fund when those funds satisfy an Indian judgment. Although the text does not furnish a definitive answer, the statutory regime governing appropriations to satisfy judgments of this court and the legislative history of the Distribution Act provide interpretive guidance.

Two statutes govern payment of this court's judgments: 28 U.S.C. § 2517 and 31 U.S.C. § 1304, each quoted *supra*, at 78 n. 21. Prior to 1863, judgments rendered by this court's predecessor, the Court of Claims, were payable only by "specific legislative enactment." *Slattery v. United States*, 635 F.3d 1298, 1301 (Fed.Cir.2011) (en banc). In the Amended Court of Claims Act of 1863, ch. 92, 12 Stat. 765, 766, Congress provided that judgments of the court were to "be paid out of any general appropriation made by law for the payment and satisfaction of private claims." *Slattery*, 635 F.3d at 1302. That provision "removed the need for a special congressional appropriation to pay each individual judgment" and is now codified as amended at 28 U.S.C. § 2517. *Id.* at 1302.

"Following the 1863 enactment, Congress made periodic general appropriations for payment of the judgments of the Court of Claims, initially on an annualized basis, *e.g.*, Act of June 25, 1864, ch. 147, 13 Stat. 145, 148, and then by a standing appropriation that created a Judgment Fund to pay all Court of Claims judgments for which a specific appropriation did not exist, *e.g.*, Supplemental Appropriation Act, 1957, Pub.L. No. 84–814, § 1302, 70 Stat. 678, 694–95 (1956)." *Slattery*, 635 F.3d at 1302–03. Now codified as amended at 31 U.S.C. § 1304, the Judgment Fund statute provides for payments of certain judgments against the United States, including those authorized by 28 U.S.C. § 2517.[25] The Judgment Fund was created "to avoid the need for specific appropriations to pay judgments awarded by the Court of Claims." *Slattery*, 635 F.3d at 1317; *see also*

*Bell BCI Co. v. United States*, 91 Fed.Cl. 664, 668 (2010) ("Congress enacted the Judgment Fund in 1956 to eliminate the need for specific appropriations to satisfy judgments against federal agencies."). It is "a permanent, indefinite appropriation." 31 C.F.R. § 256.1.

■ Thus, pursuant to 28 U.S.C. § 2517 and 31 U.S.C. § 1304, unless provision for payment of a judgment is supplied by another statute, any final judgment issued by this court is satisfied by payment from the standing appropriation known as the Judgment Fund. *See Doe v. United States*, 16 Cl.Ct. 412, 423 (1989) ("Every final judgment of the United States Claims Court rendered against the United States is to be paid out of the judgment fund."). No additional appropriation by Congress is necessary; once the award is certified by the clerk and the chief judge of this court, it is presented to the Secretary of the Treasury. *See* 28 U.S.C. § 2517(a). Once the Secretary certifies the judgment, 31 U.S.C. § 1304(a)(2), the funds are deemed appropriated, and Treasury is charged with providing the funds to the payee. *See, e.g., United States v. Dann*, 470 U.S. 39, 42, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) (noting that once Court of Claims' judgment was certified to the General Accounting Office pursuant to 31 U.S.C. § 724a (1976 ed., Supp. V), the predecessor statute to 31 U.S.C. § 1304, "this certification automatically appropriated the amount of the award"); *see also* 31 C.F.R. §§ 256.0–.60 (Treasury regulations governing payments from the Judgment Fund); Treasury Financial Manual 6–3100, *Certifying Payments and Recording Corresponding Intragovernmental Receivables in the Federal Government's Judgment Fund* (Apr. 2009) (describing Treasury's process for administering payments under the Judgment Fund).

Notably, relevant judicial precedents also disfavor plaintiffs' position. In *Dann*, 470

---

**25.** As the Federal Circuit noted in *Slattery*, "[t]he Judgment Fund had been limited to payments up to $100,000, but Congress removed the cap, so that the Fund covers claims of any amount." 635 F.3d at 1303 (citing Supplemental Appropriations Act, 1977, Pub.L. No. 95–26, ch. 14, 91 Stat. 61, 96–97). It is likely that the original language of the Distribution Act in Senate Bill

1016 which spoke more specifically of funds being appropriated in favor of Indians was grounded in the reality that at the time the Distribution Act was passed in 1973, the $100,000 cap on the Judgment Fund would have necessitated a separate appropriation for nearly every Indian judgment.

U.S. 39, 105 S.Ct. 1058, individual plaintiffs alleged, in defense of an action in trespass brought by the United States, that they possessed aboriginal title to a portion of land that had been the subject of litigation before the Indian Claims Commission. 470 U.S. at 43, 105 S.Ct. 1058. The Claims Commission had awarded damages to the Western Shoshone tribe of Indians for the loss of aboriginal title to that land. *Id.* In *Dann,* the government contended that the plaintiffs' aboriginal-title defense was unavailing due to the collateral—estoppel effect of the Claims Commission's judgment. *Id.* The Court of Appeals for the Ninth Circuit rejected that contention, finding that the Claims Commission judgment did not yet have collateral-estoppel effect because "payment" to the Western Shoshone had not then occurred within the meaning of Section 22(a) of the Indian Claims Commission Act, which section dictated that "payment" of any claim before the Commission effected a "full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." *United States v. Dann,* 706 F.2d 919, 924, 925–27 (9th Cir.1983). The court of appeals found dispositive the fact that although funds had been appropriated and credited to an interest-bearing Treasury account in the name of the Western Shoshone, no funds had actually been disbursed to or used for the benefit of the tribe, nor had Congress then passed legislation to provide a distribution plan for the funds. *Id.* at 925–26.[26]

The Supreme Court disagreed, concluding that "payment" occurred within the meaning of Section 22(a) when the judgment in favor of the Western Shoshone was certified pursuant to 31 U.S.C. § 724a (1976 ed., Supp. V), the Judgment Fund predecessor statute to 31 U.S.C. § 1304,[27] and funds to compensate the tribe were placed by the government into an account in the Treasury. *Dann,* 470 U.S. at 44–45, 105 S.Ct. 1058. Importantly for the present case, the Court stated explicitly that the Indian Judgment Distribution Act applied to the Commission's judgment as affirmed by the Court of Claims, and "[u]nder 25 U.S.C. § 1402(a) and § 1403(a), the Secretary of the Interior [wa]s required, after consulting with the Tribe, to submit to Congress within a specified period of time a plan for the distribution of the fund." *Id.* at 42, 105 S.Ct. 1058. Although 31 U.S.C. § 724a (1976 ed., Supp. V) and 31 U.S.C. § 1304 differ in their details, their effect is the same, and there is nothing within 31 U.S.C. § 1304 that would lead to the conclusion that a judgment certified under its mandates is not subject to the Indian Judgment Distribution Act whereas one certified pursuant to its precursor was subject to the Distribution Act.

The Senate Report on the bill that became the Distribution Act is revealing in this regard, as well. As previously noted, contained within that report is a letter from the Assistant Secretary of the Interior commenting on the Distribution Act. In that letter, the Assistant Secretary objected also to a provision in Senate Bill 1016 that stated: "Within six months after the date of the appropriation of funds by the Congress to pay each Indian judgment, the Secretary of the Interior ... shall prepare and submit to the Congress a recommended plan for the distribution of such funds ... to *the Indian tribe, band, group, pueblo, or community in whose favor such judgment is rendered and such funds appropriated.*" *Hearing on S. 1016* at 5–6 (S. 1016, 93d Cong. § 4 (1973)) (emphasis added). The Secretary observed:

[W]ith the exception of a few very early Indian Claims Commission awards, neither the Indian Claims Commission *nor the Court of Claims specifies the ultimate or present-day beneficiaries of an award. Furthermore, the appropriation acts covering the awards are silent on the subject of beneficiaries. The burden of identify-*

---

**26.** In the *Western Shoshone* litigation, the Secretary failed timely to submit to Congress a distribution plan, and thus separate legislation for distribution of the funds was required. *Dann,* 706 F.2d at 926. Ultimately, Congress provided a plan for the use and distribution of the Western Shoshone funds. *See* Western Shoshone Claims

Distribution Act, Pub.L. No. 108–270, 118 Stat. 805 (2004).

**27.** *See United States v. General Elec. Corp.,* 727 F.2d 1567, 1571 (Fed.Cir.1984) ("Title 31 U.S.C. § 724a was reenacted and is now 31 U.S.C. § 1304.").

*ing beneficiaries has fallen on the Secretary of the Interior,* a process that we feel should continue to be followed because of the fact that the identification of beneficiaries often demands intense research in the cultural and political history of the involved group or groups. *This is a task that neither the Indian Claims Commission nor the Court of Claims is equipped to handle.*

*Id.* at 14 (Letter from John H. Kyl, Assistant Secretary of the Interior, to Sen. Henry M. Jackson (Apr. 12, 1973)) (emphasis added). The Assistant Secretary thus recommended the deletion of the quoted language of Section 4 and all similar text. *Id.; see also id.* at 19 (Test. of Mr. Kyl). Congress agreed, and the quoted portion of Section 4 of Senate Bill 1016, along with similar language, was struck from the bill. *See* 93 Cong. Rec. 33,180; 93 Cong. Rec. 16,375–76.

While the Assistant Secretary's objection to Section 4 of Bill 1016 appeared to be based primarily on the fact that judgments in favor of Indians and appropriations to satisfy those judgments did not list individual beneficiaries, the language to which the Secretary objected and which was ultimately struck from the bill actually spoke of funds being appropriated in favor of "the Indian tribe, band, group, pueblo, or community," not individual beneficiaries. Nevertheless, the affirmative elimination of that language is persuasive evidence that application of the Distribution Act is not dependent on a specific appropriation in the name of an Indian entity.[28]

In short, the statutory scheme governing payment of judgments by the Court of Federal Claims and the legislative history of the Indian Judgment Distribution Act convince the court that the Distribution Act applies to this case, regardless of whether the money is automatically appropriated pursuant to the Judgment Fund statute, 31 U.S.C. § 1304, or Congress enacts a specific appropriation to satisfy the judgment. Because the court concludes that the Distribution Act applies here, the court will abstain from identifying the specific individual persons who qualify as lineal descendants of the loyal Mdewakanton. Identification of beneficiaries of the final judgment is within the purview of the Secretary of Interior under the Indian Judgment Distribution Act. *See* 25 U.S.C. §§ 1402(a), 1403. The court will likewise refrain from articulation of what specific criteria claimants must satisfy to prove their status, as all facets of this determination make up the Secretary's responsibilities under the Act. *See id.*[29]

B. *Application of the Indian Judgment Distribution Act to this Case*

1. *Previously incurred costs associated with formulation of a distribution plan.*

Although the court concludes that the Distribution Act applies, it does so reluctantly. As noted, pursuant to the parties' representations at the status conference held on January 21, 2011, and the scheduling order issued on that same date, plaintiffs and plaintiff-intervenors prepared and filed 33 motions and numerous proposed findings of uncontroverted facts alleging that they are lineal de-

---

**28.** Notably, the language found in 25 U.S.C. § 1401(a) that defines the scope of the Distribution Act was present in nearly identical form in Section 3 of the original Senate Bill 1016, *see Hearing on S.* 1016 at 5 (S. 1016, 93d Cong. § 3) (1973), but no objection to that text was raised by the Assistant Secretary.

**29.** The Indian Judgment Distribution Act's delegation to the Secretary of Interior of sole authority to determine proper beneficiaries in Indian judgment cases is in keeping with a line of cases from this court that held, outside the context of the Distribution Act and prior to the lifting of the $100,000 cap on the Judgment Fund, that Congress was responsible for determining individual claimants through Congress' appropriation of

funds to satisfy the Indian judgment. *See, e.g., Turtle Mountain Band of Chippewa Indians v. United States,* 490 F.2d 935, 951 (Ct.Cl.1974); *Cherokee Freedmen & Cherokee Freedmen's Assoc. v. United States,* 195 Ct.Cl. 39, 48 (1971); *Confederated Tribes of Warm Springs Reservation of Or. v. United States,* 177 Ct.Cl. 184, 210 (1966); *Peoria Tribe,* 169 Ct.Cl. at 1011–12; *McGhee,* 122 Ct.Cl. at 396; *see also Chippewa Cree Tribe of Rocky Boy's Reservation v. United States,* 85 Fed. Cl. 646, 657 (2009) ("composition of the particularly entity or group in whose favor an award is made" was "beyond the competence of" the court where Congress had enacted specific legislation creating distribution plans for judgments at issue).

scendants of the loyal Mdewakanton. Attendant to those motions, they have obtained, sorted through, organized, and submitted to the court and the government almost 150,000 pages of material to show individual genealogies that span more than a century. Def.'s Rule 56(d) Mot. at 3. This information includes family trees, family Bibles, newspapers, books, historical accounts, Excel spreadsheets, birth certificates, and death certificates. *Id.; see also* Def.'s Mem. at 62 (recounting plaintiffs' and plaintiff-intervenors' submissions). Indeed, the court can summarize no better than the government the Herculean task plaintiffs and plaintiff-intervenors undertook to prepare this case for a final resolution:

> [I]t took [p]laintiffs years to compile their own records. *See* Declaration Regarding Persons Who Qualify as Proper Claimants in this Case, March 8, 2011, at ¶ 7 (Dkt. 898) ("Since the filing of the instant matter, [plaintiffs' counsel] has endeavored to identify individuals, who through various means but mainly birth certificates and similar authentic records, can prove their lineal descendancy."); Declaration of Barbara Buttes, March 21, 2011, at ¶ 3 (Dkt. 978-2) ("Over the eight years of this lawsuit (2003–2011), Wičaŋpi [Buttes' research firm] has employed many people, full-time and part-time, to conduct the research on 1886 Mdewakanton descendancy.") (Dkt. 978-2). Indeed, merely to identify [p]laintiffs, the lead [p]laintiffs' attorney "went on a tour of the Sioux Reservation[s] in South Dakota and six states and two nations." Transcript, Attorney Erick Kaardal, p. 112 (June 10, 2005).

Def.'s Rule 56(d) Reply at 5.

Plaintiffs' and plaintiff-intervenors' efforts were accomplished at the insistence of the government, which has demanded from the inception of this case that all plaintiffs be individually named and identified as lineal descendants in this case. *See, e.g., Wolfchild IV*, 77 Fed.Cl. at 33 ("The government states that it and other parties to this action are 'entitled to certainty and closure respecting the number and identities of the persons' participating in this suit."); Def.'s Mot. to File Exs. under Seal at 2, *Wolfchild v. Unit-*

*ed States*, No. 03–2684 (Fed.Cl. filed Sept. 13, 2007) ("Names of minors and their ages are necessary to the determination of whether these individuals have previously been admitted as parties....."); Def.'s Resp. to Mot. to Substitute Legal Counsel at 1, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Feb. 23, 2007), ECF No. 430 ("The United States opposes the motion to the extent that it seeks to add as new plaintiffs any persons who have not already moved for, and been granted, intervention."); Def.'s Opp'n to Pls.' Mot. to Amend Third Amended Compl. at 2, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Feb. 2, 2007), ECF No. 418 ("In a case in which such matters as lineage, tribal affiliation, and severance of tribal relations may play a significant role, it is particularly important for the [d]efendant to know for certain who the [p]laintiffs (and [p]laintiff-[i]ntervenors) are."); Def.'s Opp'n to Du-Marce Mot. to Intervene at 2, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Nov. 8, 2006) ("As it has previously noted, the United States is entitled to have certainty and closure respecting the number and identities of the persons who are suing it in this action....."); Def.'s Mot. for Disclosure of Names of John Doe Plaintiff–Intervenors at 1, 4, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Oct. 24, 2006) ("Defendant ... moves ... for an [o]rder directing counsel ... to provide ... the United States with the identities of those John Doe plaintiffs.... Defendant is entitled to know who is suing it ... This is particularly true in light of the fact that all claims in the case rest, in part, on allegations regarding the lineage of the persons who are suing ... No litigant should be forced to defend itself against phantom plaintiffs, nor carry the logistical burden of keeping track of hundreds of 'John Does' who may or may not exist."); Def.'s Opp'n to DuMarce Mot. to Amend First Amended Compl. at 3, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Oct. 23, 2006) ("As it has previously noted, [d]efendant is entitled to have certainty and closure respecting the number and identities of the persons who are suing it in this action....."); Def.'s Opp'n to Rooney Mot. to Amend at 2, *Wolfchild v. United States*, No. 03–2684 (Fed.Cl. filed Oct. 10, 2006) (same).

The government's position regarding claimants adopted at the outset and maintained until the very last submissions has driven the course of this litigation and is directly opposed to the terms of the Distribution Act, which contemplate that the government was not entitled to such specific identification at any time prior to a judgment, given that development of a plan under the Distribution Act would follow entry of a judgment.

Not only was the government in error to demand identification of plaintiffs and proofs of descent throughout this case, under the Indian Judgment Distribution Act it is the Secretary of Interior, not plaintiffs' attorneys or the court, who must sort through the thousands of documents, compile the pertinent records, and undertake the historical research to determine the appropriate templates by which to adjudicate claimant eligibility. In short, it is the Department of the Interior that is charged with the task of determining whether each claimant's supporting documentation demonstrates lineal descendancy. The pertinent regulations provide:

(a) *The Secretary shall cause to begin as early as possible the necessary research to determine the identity of the ultimate or present day beneficiaries of judgments. Such research shall be done under the direction of the Commissioner of Indian Affairs.* The affected tribes or groups shall be *encouraged* to submit pertinent date. *All pertinent data,* including cultural, political and historical material, and records, including membership, census and other roll *shall be considered . . . .*

(b) *The results of all research shall be provided to the governing bodies of all affected tribes and groups.* The Area Director shall assist the affected tribe or group in arranging for preliminary sessions or meetings of the tribal governing body, or public meetings. *The Area Director shall make a presentation of the results of the research* and shall arrange for expertise of the Bureau of Indian Affairs to be available at these meetings to assist the tribe or group in developing a use or distribution proposal. . . .

25 C.F.R. § 87.3 (emphasis added). In the Joint Status Report of May 27, 2011, the government provided an illuminating example of the scope of the work required under the Distribution Act. The government explained that in the context of the *Western Shoshone* litigation, *see supra,* at 84–85 & n. 26:

The Bureau received more than 9,000 applications to share in the judgment. The documents to which claimants had to show genealogical connections were census rolls generated from 1885 to 1940. The Bureau started accepting applications in October 2007. The first distribution was made in March 2011; the final distributions have not yet been made. *The Bureau hired a contractor to perform the voluminous research. The Bureau paid the contractor approximately $1.5 million for two years of work. The Bureau elected not to endorse the third year of the contract, assuming direct responsibility for the work to be done. To date, the Bureau has expended about one million dollars above what it paid the contractor.*

The underlying documentation, i.e., census roles, birth certificates, etc. in Western Shoshone[,] is generally more recent, reducing the research by one or possibly two generations. Depending on the criteria to qualify for a distribution in this case, the number of Wolfchild applicants could be twice the size of the Western Shoshone claimant group.

Joint Status Report at 13 (emphasis added).

As demonstrated by the government's recitation of the work required in the Western Shoshone litigation, plaintiffs' and plaintiff-intervenors' assembly of the pertinent records into a readily analyzable format in effect will enable the government to avoid incurring a substantial part of the costs entailed in complying with the Indian Judgment Distribution Act. In light of these circumstances, the government shall reimburse plaintiffs and plaintiff-intervenors for the costs of preparing the materials that plaintiffs and plaintiff-intervenors submitted in support of their claims of eligibility as to the stipulated funds.

The government's unjustified litigation posture has caused plaintiffs to expend resources that properly should have been borne by the government, and the plaintiffs deserve recompense for those efforts. Such reimbursement will also carry out the Department of the Interior's obligation to make financial resources available to the claimant group to aid in "develop[ing] and communicat[ing] to the Secretary ... its own suggested plan for the distribution and use of [the judgment] funds." 25 U.S.C. § 1403(b).

## 2. *Review and approval of a distribution plan.*

A final point regarding the administration of this case under the Indian Judgment Distribution Act must be addressed. The government contends that "[i]f the Act applies to any judgment entered in this case, this [c]ourt's role terminates after certification of the judgment to the Secretary of the Treasury and allocation of appropriated funds for the judgment." Def.'s Supplemental Br. at 5; *id.* at 13 ("The court[']s role in Indian tribal or group judgment actions is limited to rendering judgments and certifying those judgments to the Secretary of the Treasury for payment pursuant to 31 U.S.C. § 1304."). It avers that "[u]nder the Act, the Secretary of the Interior must create and Congress

approves the plan for distribution and use of the appropriated funds." *Id.* at 6.

The Indian Judgment Distribution Act ostensibly provides that the Secretary must submit to Congress the distribution plan within one year of the appropriation of the funds to satisfy the judgment. *See* 25 U.S.C. § 1402(a).[30] The distribution plan becomes effective at the end of the sixty-day period beginning on the day the plan is submitted to Congress, unless during that period "a joint resolution is enacted disapproving such plan[ ]." 25 U.S.C. § 1405(a). Upon enactment of a joint resolution, the Secretary must submit to Congress within thirty days proposed legislation authorizing distribution of the funds. 25 U.S.C. § 1405(b).

This aspect of the Indian Judgment Distribution Act reflects an amendment adopted in 1983 to cure a constitutional defect in the original terms of the Act. Initially the Distribution Act incorporated a legislative-veto provision identical in effect to that deemed unconstitutional in *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).[31] *See* Pub.L. No. 93–134, § 5, 87 Stat. 466, 468 (1973) (Proposed distribution plans submitted to Congress would take effect unless "during such sixty-day period either House adopts a resolution disapproving such plans."). The curing amendment adopted in 1983 was en-

---

**30.** Amendments to the Distribution Act in 1983 extended the time to one year from one hundred eight days originally provided. *See* Pub.L. No. 97–458, § 1, 96 Stat. 2512 (Jan. 12, 1983).

**31.** In *Chadha,* the Supreme Court faced the question of the constitutionality of a one-House veto over executive action. Section 244(a)(1) of the Immigration and Nationality Act permitted the Attorney General to suspend the deportation of an alien if that alien met certain statutory prerequisites. 42 U.S.C. at 923–24. A separate provision of the Act, Section 244(c)(1), granted to Congress the power to override and veto the Attorney General's suspension of deportation via a resolution adopted by either the House of Representatives or the Senate. *Id.* at 925. The Supreme Court concluded that the legislative veto violated the Presentment Clauses of Article I, Section 7, Clauses 2 and 3, and the Bicameralism requirement of Article I, Sections 1 and 7. The Court determined that Congress' invocation of the veto power granted to it under the Act constituted legislative action because it "alter[ed] the legal rights, duties and relations of persons,

including the Attorney General, Executive Branch officials, and [the alien subject to deportation], all outside the legislative branch." *Chadha,* 462 U.S. at 951–52, 103 S.Ct. 2764. Absent the veto provision in Section 244(c)(2), Congressional overruling of the Attorney General's suspension determination could be achieved, if at all, only through legislation enacted pursuant to Article I. *Id.* at 953–54, 103 S.Ct. 2764. Because the veto was legislative action, "that action was subject to the standards prescribed in Article I" and could not be exercised outside of the careful process delineated in that part of the Constitution. *Id.* at 956–57, 103 S.Ct. 2764. Accordingly, the one-House veto was a violation of separation of powers and was thus unconstitutional. *Id.* at 959, 103 S.Ct. 2764.

Notably, the legislative veto contained within the Indian Judgment Distribution Act was listed in an Appendix to Justice White's dissent in *Chadha* listing then-current legislative vetoes which Justice White believed were invalidated by the majority opinion in *Chadha,* 462 U.S. at 959–60, 1012, 103 S.Ct. 2764.

acted prior to the Supreme Court's decision in *Chadha* but subsequent to the decision of the United States Court of Appeals for the Ninth Circuit in *Chadha v. Immigration & Naturalization Service*, 634 F.2d 408 (9th Cir.1980) (op. by Kennedy, J.), which decision was affirmed by the Supreme Court in due course. The Congressional cure in the form of requiring a joint resolution to be enacted to disapprove a proposed distribution plan satisfied both the Bicameralism and Presentment Clauses of the Constitution.[32]

Although Congress cured a constitutional flaw in the statutory regime for developing and implementing a distribution plan for judgments in certain Indian cases, it introduced another equally significant defect by legislative action taken in 1995. The provisions cited by the government calling for the Secretary to submit a distribution plan to Congress have been repealed. In 1995, Congress enacted the Federal Reports Elimination and Sunset Act of 1995, Pub.L. No. 104–66, 109 Stat. 707. Intended to "alleviate the burden on the Executive Branch [and] to also allow the [g]overnment to focus its energy on more important issues, thereby better utilizing their time," H.R. Rep. No. 104–327 (1995), 1995 WL 683033, at *23, that Act dictated that certain provisions of law mandating the submission of reports to Congress were void as of the date of enactment or four years thereafter, *id.* at *25. Among the reporting requirements that were to be eliminated four years after the date of enactment of the law were those mandated by the Distribution Act under Sections 1402(a) and 1404 of Title 25. 109 Stat. at 734–35 (eliminating the reporting requirements listed in H.R. Doc. No. 103–7 (1993)); H.R. Doc. No. 103–7, at 113 (listing reporting requirements under 25 U.S.C. § 1402(a) and § 1404 as among

those being abrogated). Thus, contrary to the government's contentions, the Secretary is no longer required or allowed to submit its proposed distribution plan to Congress.

To say the least, application of a repealed statutory provision will not do. The court is presented with a statute that has been decimated. The question arises whether means of filling the resulting very substantial gap are available. This court has judicial power to remit and remand "appropriate matters" to executive officials, *see* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *Mendoza v. United States*, 87 Fed.Cl. 331, 337–38 (2009) (partially remanding a claim for pay and benefits to the Office of Personnel Management, where that office had statutory authority over aspects of the claim), and the court has inherent power to effectuate its judgments. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("[C]ertain implied powers must necessarily result to ... [c]ourts of justice from the nature of their institution.... These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' " (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962))); *Riggs v. Johnson Cnty.*, 73 U.S. (6 Wall.) 166, 187, 18 L.Ed. 768 (1867) ("[T]he rule is universal, that if the power is conferred to render the judgment ..., it also includes the power to issue proper process to

---

**32.** *See Constitution, Jefferson's Manual, and Rules of the House of Representatives*, H.R. Doc. No. 108–241, 108th Cong., 2d Sess. § 397 (2005) ("A[ ] development of the modern practice is the joint resolution, which is a bill so far as the processes of the Congress in relation to it are concerned. With the exception of joint resolutions proposing amendments to the Constitution, all these resolutions are sent to the President for approval and have the full force of law. They are used for what may be called the incidental, unusual, or inferior purposes of legislating.") (citations omitted); *see also International Brother-*

*hood of Elec. Workers v. Washington Terminal Co.*, 473 F.2d 1156, 1164 (D.C.Cir.1972) ("That a joint resolution was used [by Congress] to accomplish the intended result does not detract from the legislative character of the action.")

Congress made similar changes to other laws to cure the constitutional infirmity identified in *Chadha. See United States v. Amirnazmi*, 645 F.3d 564, 581 n. 26 (3d Cir.2011) (discussing an amendment to the National Emergencies Act to replace a termination of an emergency by "concurrent resolution" of Congress with termination of an emergency by a "joint resolution.").

enforce such judgment or decree."); *see also Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135–38 (2004) (addressing various inherent powers); 28 U.S.C. § 2521(c) ("The United States Court of Federal Claims shall have such assistance in the carrying out of its lawful writ, process, order, rule, decree, or command as is available to a court of the United States."). Exercising those powers offers the best prospect of adhering to the terms of the Distribution Act insofar as it is legally possible to do so. Accordingly, the court will issue a remit, remand, and direction to the Secretary of the Interior to provide a report to the court within the time specified in 25 U.S.C. § 1402, submitting his or her "plan for the use and distribution of the funds" awarded to the lineal descendants of the loyal Mdewakanton, 25 U.S.C. § 1402(a). Upon receipt of the report, the court will entertain potential proceedings to review the report, as provided in RCFC 52.2(f). This disposition will enable the court to take the "necessary steps to insure the[ ] speedy determination" of the case, at least to the extent that any such determination is possible. *Navajo Tribe of Indians v. United States*, 601 F.2d 536, 540 (Ct.Cl.1979).

### C. *Summary Judgment*

Because the court has no direct role in specifying the individual persons entitled to share in a judgment in favor of the descendants of the loyal Mdewakanton as an identifiable group of Indians, and because the amount of the funds to which the descendants are entitled based upon plaintiffs' and intervening plaintiffs' use-restriction claims has been set by stipulation of the parties, there is no genuine dispute of any material fact regarding those claims. As a result, plaintiffs and intervening plaintiffs are granted summary judgment on their use-restriction claims for $673,944, measured as of January 1, 2011.

### III. JUDGMENT UNDER RULE 54(b)

Pursuant to RCFC 54(b), this court is authorized to "direct entry of a final judgment as to one or more, but fewer than all claims," upon the finding that "there is no just reason for delay." RCFC 54(b). In this case there is no reason to delay further the final resolution of the claims regarding the restricted-

use funds. The court will enter final judgment as to those claims.

Entry of a judgment under Rule 54(b) will allow the Secretary of the Interior to develop a roll of eligible claimants and prepare a distribution plan. Partial final judgments are expressly authorized under 28 U.S.C. § 2517(b), and 31 U.S.C. § 1304(a)(3)(A) provides for payment from the Judgment Fund of all those judgments payable under Section 2517. Once the judgment is certified and the money automatically appropriated, the Secretary shall begin the work necessary to create a distribution plan in accordance with the Indian Judgment Distribution Act.

### IV. CONCLUSION

For the reasons stated, the court DENIES plaintiffs' and plaintiff-intervenors' motions to amend their respective complaints to include claims grounded in the Indian Non-Intercourse Act and the 1863 Acts. The Robertson–Vadnais group of plaintiff-intervenors' motion to amend to add a takings claim under the Fifth Amendment is likewise DENIED. The motions to allow the various other proffered amendments to plaintiffs' and plaintiff-intervenors' complaints are GRANTED. The government's motion to dismiss claims grounded in the 1863 Acts is GRANTED as to the Julia DuMarce Group and the Harley Zephier Group of plaintiff-intervenors. The government's motion to dismiss is otherwise DENIED, as is the government's motion to defer consideration under RCFC 56(d).

Plaintiffs' and plaintiff-intervenors' motions for summary judgment are GRANTED IN PART, *i.e.*, they are granted as to the claims based upon the use restrictions in the 1888, 1889, and 1890 Appropriation Acts. The government's cross-motion for summary judgment is DENIED. There being no just reason for delay, and because entry of a final judgment on the use-restriction claims will materially advance the ultimate resolution of this litigation, the court directs entry of final judgment as to the use-restriction claims pursuant to RCFC 54(b). The clerk is directed to enter a final judgment in favor of plaintiffs and plaintiff-intervenors against the United States on the use-restriction claims in

the amount of $673,944, measured as of January 1, 2011. Distribution of the judgment shall be made pursuant to the Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401–07.

To effectuate the Distribution Act given the repeal of the provisions providing for reports to Congress regarding a proposed distribution plan, the matters of developing a roll of eligible claimants and a plan for distribution of the funds awarded shall be and are remitted and remanded to the Secretary of the Interior pursuant to 28 U.S.C. § 1491(a)(2) and RCFC 52.2(a). In carrying forward with his or her responsibilities under the Distribution Act, the Secretary shall provide reimbursement pursuant to 25 U.S.C. § 1403(b) to plaintiffs and intervening plaintiffs for their costs in preparing and submitting to the court and the government, genealogies to establish their status as eligible claimants. In accord with 28 U.S.C. § 1402, the Secretary shall complete preparation of such roll and plan satisfying the criteria specified in 25 U.S.C. § 1403 within one year from the date of this decision and judgment. Upon completion, the Secretary shall submit a report to the court setting out the proposed roll and plan.

Plaintiffs are awarded their costs of suit.

It is so ORDERED.